MARSHALL DURBIN FOOD CORPORATION, a corporation, Plaintiff–Appellee,

v.

The EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES, Defendant-Appellant.

No. 86–7307.

United States Court of Appeals, Eleventh Circuit.

Dec. 23, 1987.

Jack B. Porterfield, Jr., Mark S. Boardman, Birmingham, Ala., for defendant-appellant.

Frank M. Young, III, Haskell, Slaughter, Young & Lewis, Jonathan H. Waller, Birmingham, Ala., for plaintiff-appellee.

Before FAY, Circuit Judge,
HENDERSON[*], Senior Circuit Judge,
and FORRESTER,[**] District Judge.

[*] See Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

[**] Honorable J. Owen Forrester, U.S. District Judge for the Northern District of Georgia, sitting by designation.

1. Equitable expressed projected claims and incurred claims as percentages of the billed premium and referred to them as the "objective loss ratio" and the "actual loss ratio" respectively. For example, in policy year 1981 the billed premium was $854,621. The projected claims were $750,357 or 87.8% of the billed premium

FAY, Circuit Judge:

This appeal challenges whether there was sufficient evidence of fraud or breach of contract for a reasonable jury to render a verdict awarding actual and punitive damages. The Marshall Durbin Food Corporation ("Durbin") brought a diversity action against the Equitable Life Assurance Society of the United States ("Equitable") for the recovery of surplus insurance premiums allegedly due to Durbin under a retrospective premium agreement. The jury returned a verdict for Durbin. Because we find that the evidence presented was sufficient to support the jury verdict, we affirm.

## BACKGROUND

Effective January 1, 1976, Equitable issued to Durbin three group policies, including a group health insurance policy. Equitable divided Durbin's group health insurance premium into two basic categories, projected claims and retention. "Projected Claims" represented an estimation by Equitable's actuaries of Durbin's incurred claims for the applicable policy year. "Retention" consisted of monies reserved for Equitable's costs and expenses in handling the claims.

The group health policy included a document known as a retrospective premium adjustment rider ("retro-rider"). Under the retro-rider, when the incurred claims exceeded the projected claims, Durbin would pay Equitable an additional premium to cover the difference.[1] The retro-rider did not specify what would happen if incurred claims were less than projected claims.[2]

(the objective loss ratio). Incurred claims totaled $787,853 or 92.2% of the billed premium (the actual loss ratio). In this policy year Durbin paid Equitable a retrospective "pickup" premium to compensate for the excess incurred claims over projected claims.

2. The relevant section of the retro-rider states: "If on any adjustment date the ratio of such total amount of Incurred Claims to such total amount of Billed Premiums is greater than [the objective loss ratio for the applicable policy year], a retrospective premium adjustment shall be due to the Society as of that date...."

Upon obtaining coverage, Durbin inquired whether Equitable would pay a refund if Durbin's actual claims were less than expected. On June 11, 1976, Equitable responded with a letter to Durbin explaining how the retro-rider would operate. It stated that "[i]n the event the claims should be less than 82%, the dividend would be paid to bring your rate up to at least 82%. Of course, all the above is subject to renewal each year on the anniversary date of your policy...." [3]

At this time, Durbin also asked Equitable for a breakdown of the charges that made up retention. Equitable responded with a letter which itemized first year acquisition expenses of $24,549. Thereafter, Equitable sent Durbin annual breakdowns of the amounts included in retention. Significantly, acquisition expense was not listed on any of these subsequent itemizations until Durbin terminated the policy.

In 1978, Equitable changed the policies' annual anniversary date from January 1 to April 1. The policies continued in effect through the last annual anniversary date of April 1, 1982, and then for a final three month period through June 30, 1982, referred to as the "Final Policy Period."

In policy years 1976, 1977, 1978 and 1981 Durbin's incurred claims exceeded projected claims, and Durbin paid additional retrospective "pickup" premiums to Equitable in those years. In policy years 1979 and 1980, however, incurred claims were less than expected, and Equitable paid Durbin return premiums of $39,415 and $19,201 respectively. Equitable identified these monies as "dividend or retroactive rate refunds."

By September, 1980 Durbin had become dissatisfied with Equitable's insurance program. Durbin asked Equitable whether it would be penalized if it terminated its coverage. Equitable responded that a dividend calculation would be made upon termination and that Durbin would not receive

any penalty. Equitable also stated that in the event of termination it would treat Durbin "the same way that [it] had in the past."

Effective June 30, 1982, Durbin terminated its insurance coverage. During the Final Policy Period, Durbin's incurred claims were $51,594 less than the projected claims, but Equitable did not return a surplus premium to Durbin.[4] Instead, in September, 1983 Equitable billed Durbin for a retrospective "pickup" premium of $56,133. Equitable later offered to consider this discrepancy a "wash."

Durbin requested information showing the final figures of the Final Policy Period. In December, 1983 Equitable's responding letter revealed that Equitable charged a total of $81,603 (or 28% of the billed premium) for retention. A breakdown of retention provided in January, 1984 disclosed two extraordinary items—"balance of acquisition expense" in the amount of $20,462 and "investment selection charge" in the amount of $19,722. Equitable refused Durbin's request to refund any premium or dividend.

On October 25, 1984, plaintiff Durbin filed suit against Equitable in the United States District Court for the Northern District of Alabama seeking to recover surplus premiums for the Final Policy Period. Count one alleged that Equitable breached its contract by refusing to pay Durbin a surplus premium due under the health policy's agreed formula for the computation of the retrospective premium adjustment. Count two alleged that Equitable fraudulently represented that it would determine whether a surplus premium is due in the same manner as during previous renewal periods, and that it would refund any surplus premium to Durbin upon termination of the group health policy.

A jury trial commenced on March 17, 1986. On March 20, 1986 the jury rendered

---

**3.** Eighty-two percent (82%) was the objective loss ratio for policy year 1976.

**4.** Durbin's billed premium during the three month Final Policy Period was $291,342. The objective loss ratio for the 1982 policy year was

87.8% representing projected claims of $255,798 for the three month period. The incurred claims for this period totaled $204,204 or 70.1% of the billed premium. The difference between projected and incurred claims was $51,594.

its verdict for Durbin awarding compensatory damages of $46,060 and punitive damages of $1,000,000.

## DISCUSSION

The principal issue in this appeal is whether there was sufficient evidence presented in the trial court to submit the breach of contract and fraud issues to the jury. When reviewing the sufficiency of the evidence supporting a general jury verdict, we are not free to substitute our judgment for that of the jury. *Griffin v. Swim-Tech Corp.*, 722 F.2d 677, 679 n. 1 (11th Cir.1984). Rather, our inquiry is limited to determining "whether or not reasonable jurors could have concluded as this jury did based upon the evidence presented." *Id.* While making this determination, we are obliged to examine all the evidence and draw reasonable inferences in favor of the party prevailing in the district court. *Quinn v. Southwest Wood Products, Inc.,* 597 F.2d 1018, 1019 (5th Cir.1979).

### A. Breach of Contract

The trial court did not err in submitting the contract claim to the jury. Equitable asserts here as it did at trial that Durbin is not entitled to a dividend or retroactive rate refund. Equitable claims that it uniformly applies a national dividend formula to determine whether any insured receives a dividend. Accordingly, under the 1982 dividend formula, Durbin was not due a dividend notwithstanding the acquisition or investment selection expenses included in retention.

Durbin, on the other hand, contends that it is entitled to a retroactive rate refund for the Final Policy Period. Durbin claims that Equitable paid it a refund each year in which the actual loss ratio was less than the objective loss ratio, and that the amount of the refund equalled the billed premium minus retention and incurred claims. Durbin further asserts that by fraudulently including the acquisition and investment selection charge included in retention for the Final Policy Period, Equitable prevented it from receiving a dividend.

We disagree with Equitable's position on this issue. Compelling evidence presented at trial showed that the contract between the parties required Equitable to pay Durbin a retroactive rate refund when the actual loss ratio was less than the objective loss ratio.[5] Equitable calculated the dividend or return premium paid in policy years 1979 and 1980 in the precise manner Durbin alleges. Specifically, Equitable subtracted incurred claims and retention from the billed premium; the remainder was the dividend or retroactive rate refund.

Further, evidence in the trial court showed that the parties agreed that Equitable's retention charges would not exceed the difference between one hundred percent (100%) of the billed premium and the objective loss ratio stated in the applicable retro-rider agreement. By assessing charges for "balance of acquisition" and "investment selection" in the Final Policy Period, Equitable caused retention to double to approximately 28% of billed premi-

5. Equitable paid Durbin premium refunds or dividends in policy years 1979 and 1980. Durbin paid Equitable retro "pickup" premiums in policy years 1976, 1977, 1978 and 1981. The chart below summarizes yearly premiums retentions and claims:

| | Total Premium | Objective Loss Ratio | Retention | Retention as % of Premium | Incurred Claims | Actual Losses as % of Premium |
|---|---|---|---|---|---|---|
| 1976 | 393,513 | 82.0% | 52,128 | 13.2% | 371,771 | 94.4% |
| 1977 | 566,145 | 82.0% | 59,531 | 10.5% | 465,495 | 82.2% |
| 1978 | 472,329 | 82.0% | 48,783 | 10.3% | 402,682 | 85.25% |
| 1979 | 500,420 | 85.2% | 52,550 | 10.5% | 402,011 | 80.3% |
| 1980 | 507,125 | 85.2% | 54,796 | 10.8% | 416,867 | 82.2% |
| 1981 | 854,621 | 87.8% | 99,570 | 11.6% | 787,853 | 92.2% |
| Final Policy Period | 291,342 | 87.8% | 81,603 | 28.0% | 204,204 | 70.1% |

um. Retention charges had never before been more than 13.8% of the billed premium. Because the objective loss ratio for the 1982 policy year was 87.8%, the ratio of retention charges to premium should not have exceeded 12.2% of $291,342 (the billed premium) or $35,543.[6]

There was sufficient evidence such that a reasonable jury could determine that incurred claims during the Final Policy Period were less than projected claims and that Durbin was entitled to a retroactive rate refund. A reasonable jury could find that Equitable treated Durbin differently and penalized Durbin by assessing new and excessive retention charges upon termination.

### B. Fraud

■ The trial court did not err in submitting the fraud claim to the jury. This Court has recognized that the elements of a cause of action for fraud under Alabama law are as follows:

(a) a false representation concerning an existing material fact; (b) a representation which (1) the defendant knew was false when made, or (2) was made recklessly and without regard to its truth or falsity, or (3) was made by telling plaintiff that defendant had knowledge that the representation was true while not having such knowledge; (c) reliance by the plaintiff on the representation and that he was deceived by it; (d) reliance which was justified under the circumstances; (e) damage to the plaintiff proximately resulting from his reliance.

*First Virginia Bankshares v. Benson*, 559 F.2d 1307, 1313 (5th Cir.1977) (citations omitted), *cert. denied*, 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978); *see also Neff v. Kehoe*, 708 F.2d 639, 642 (11th Cir.1983) (per curiam). To recover for fraud under Alabama law, which governs the substantive aspects of this diversity case, the plaintiff must establish that Eq-

uitable represented that it would calculate the dividend with respect to the Final Policy Period in the same manner as it had in the past, and that such promise was made with the present intent not to perform. *See Williams v. United Insurance Company of America*, 634 F.2d 813, 815 (5th Cir. Unit B 1981).[7] After careful review of the record, we believe that, at trial, Durbin presented sufficient evidence of actionable fraud by Equitable to satisfy each of the requisite elements for a fraud claim under Alabama law.

The evidence showed that Equitable's representations regarding retention charges and refund of premium were material. Misrepresentations relating to the price of a product or service can be material. *See Village Toyota Co. v. Stewart*, 433 So.2d 1150, 1154 (Ala.1983) (per curiam). The misrepresentations upon which Durbin based its claims all related to Durbin's ultimate cost of purchasing group health insurance from Equitable. Because these false representations directly affected the price of insurance, they were material.

Evidence admitted at trial showed that Equitable knowingly made false representations. This Court recently recognized that under Alabama law an intent to deceive may be inferred from a showing that representations were made wilfully, recklessly or mistakenly. *Neff*, 708 F.2d at 642. Equitable expressly agreed that upon termination it would neither penalize nor treat Durbin differently than it had in the past. After charging Durbin for acquisition expenses in the first year, Equitable secretly accrued annual acquisition expenses on its books. Equitable never included such charges in its breakdowns of retention until the Final Policy Period.

When queried at trial about Equitable's motive and intent in concealing the deferred acquisition charges, Fred Bicknese, the Equitable underwriting manager re-

---

**6.** We note that in calculating its damages Durbin did not use the same method of calculating the retroactive rate refund as Equitable used in policy years 1979 and 1980. Instead, Durbin subtracted the maximum allowable retention (12.2% of the billed premium) of $35,543 from the actual retention of $81,603 leaving a differ-

ence of $46,060 in damages. We view this method as equally acceptable.

**7.** The holdings of Unit B of the Fifth Circuit bind the Eleventh Circuit. *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33, 34 (11th Cir.1982).

954

sponsible for Durbin's account, admitted that Equitable deferred these charges because disclosing all of them in the first year, "wouldn't paint us in a very favorable light." Equitable deferred substantial amounts of acquisition expenses, and later penalized Durbin by assessing those expenses only when Durbin terminated its policies. Contrary to its representation, Equitable knew that it would charge Durbin extraordinary expenses, and therefore, would not treat Durbin the same upon termination as it had at renewal. Clearer evidence of fraudulent intent is difficult to imagine.

The evidence at trial showed that Durbin reasonably relied upon Equitable's representations and that these false representations proximately caused Durbin's damages. We find that there was sufficient evidence presented in the trial court such that a reasonable jury could determine that Equitable committed an actionable fraud upon Durbin.

### C. Other Issues Presented

Equitable asserts that the court erred in submitted both contract and tort claims to the jury. We disagree. Alabama law is clear that where the plaintiff does not seek to rescind a contract based upon fraud, but rather sues for breach of contract and fraud by the defendant in performing the contract, then both the contract and tort claims are proper for submission to the jury. *See Herring v. Prestwood,* 414 So.2d 52, 57–58 (Ala.1982).

Equitable argues that Durbin presented insufficient evidence to support a claim for punitive damages. It asserts that to support such a claim, Durbin must not only show that the alleged misrepresentation was committed with the intent to deceive, but that it was also gross, malicious and oppressive. Equitable is incorrect. Proof of intent to deceive alone is sufficient. *Washington National Insurance Co. v. Strickland,* 491 So.2d 872, 876 (Ala. 1985); *American Honda Motor Co. v. Boyd* 475 So.2d 835, 838–39 (Ala.1985). "[E]vidence of gross, malicious, or oppressive conduct need not be found before a jury can impose punitive damages. All that is necessary is that there be evidence to establish an intent to deceive or defraud on the part of the defendant." *Washington National* 491 So.2d at 876. The evidence presented at trial was sufficient to establish Equitable's intent to deceive, thus supporting Durbin's claim for punitive damages.

Equitable next claims that the trial court erred in allowing an expert witness, Ron Collins, to testify on behalf of Durbin. We disagree. Prior to trial, Equitable filed a motion *in limine* seeking to exclude Collins' testimony or, in the alternative allowing Equitable to depose Collins and then present its own expert. The court granted the alternative relief requested by Equitable. Equitable deposed Collins then offered as an expert, Daniel McCarthy, who testified at length by deposition introduced at trial. The ruling of the trial court was proper, Equitable was afforded the opportunity to present expert testimony and we find no error.

Equitable then complains that it should have been allowed to further qualify Jean Rassel, its company representative at trial. The trial court, in the exercise of its discretion, properly limited testimony as to Rassel's qualifications. Federal Rule of Evidence 104 specifically provides that preliminary questions concerning the qualifications of a person to be a witness are properly determined by the trial court. The advisory committee's note to this Rule explains: "To the extent that these inquiries [regarding qualification of a person to be a witness] are factual, the judge acts as the trier of fact." Federal Rule of Evidence 611 provides the trial court with the authority to reasonably control interrogation of witnesses. This is all that the trial court did with respect to Rassel. Moreover, this limitation was proper because Equitable sought to offer Rassel as an expert, although Equitable had failed to previously identify her as such. Upon timely objection by Durbin, the court properly refused to allow Equitable to present Rassel as an expert. We find no abuse of discretion.

Finally, Equitable claims that it was "ambushed" at trial because Durbin's complaint did not plead fraud with particularity as required by Fed.R.Civ.P. 9(b). This claim is without merit because Equitable obtained extensive pretrial discovery dealing with Durbin's fraud claim. Further, the Pretrial Order specifically described the fraud claim. Indeed, the record shows that the trial court overruled plaintiff's motion to amend its complaint. When viewed in light of our limited standard of review, we cannot say that the district court abused its discretion by not requiring an amended complaint from the plaintiff. *Cf. Friedlander v. Nims,* 755 F.2d 810, 813 n. 3 (11th Cir.1985) (directing courts to "harmonize the directives of rule 9(b) with the broader policy of notice pleading"). The parties were well aware of the issues involved including Durbin's claim of fraud.

### D. Conclusion

In sum, we find that the trial court did not err in submitting breach of contract or fraud claims to the jury. We hold that there was sufficient evidence presented for a reasonable jury to conclude as this jury did.

The judgment of the district court is AFFIRMED.