Jimmy QUINN, Plaintiff-Appellee,

v.

SOUTHWEST WOOD PRODUCTS, INC. and Western Auto Supply Company, Defendants-Appellants.

No. 77–1701.

United States Court of Appeals, Fifth Circuit.

July 2, 1979.

Lancaster Smith, Harvey L. Davis, Dallas, Tex., for Western Auto Supply Co.

John M. O'Quinn, Houston, Tex., for plaintiff-appellee.

Before JONES, CLARK and GEE, Circuit Judges.

GEE, Circuit Judge.

In this case a wooden ladder complying with or exceeding in its design all relevant OSHA and industry standards has been found by a jury to be nevertheless unreasonably dangerous to the user because its design was defective.[1] The evidence supporting this finding is sketchy and meager. We conclude that although it is sufficient to permit a guess or suspicion that the ladder failed through faulty design, it is not substantial. Our decision in *Simien v. S. S. Kresge Co.*, 566 F.2d 551 (5th Cir. 1978),[2] therefore requires us to reverse if the question of evidentiary sufficiency has been preserved for our review. Since we also conclude that it has been—though somewhat inartfully—we do so.

## The Evidence

■ In reviewing the sufficiency of evidence to support a jury verdict, we must consider it all, drawing all reasonable inferences in favor of the prevailing party. In this case, that party is Mr. Quinn. The dispositive issue is whether this stepladder was so defective when it left the manufacturer's hands that it created an unreason-

---

1. Such meager evidence as there is regarding the ladder's workmanship and materials is to the effect that these were all right. No party argues the contrary; defectiveness of design is the sole theory of liability given the jury by the charge.

2. In that case, a Texas diversity one like this, we held:

   This testimony that the fabric far exceeded the minimum federal requirements is evidence, indeed substantial evidence, that the jacket was not unreasonably dangerous. *See Bellotte v. Zayre Corp.*, 531 F.2d 1100 (1st Cir. 1976) (applying Restatement (Second) of Torts § 402A as adopted by New Hampshire).

Nevertheless, we recognize that other courts in addressing this problem have held that compliance with the standard is not conclusive as a measure of defectiveness on unreasonable danger. *See Raymond v. Riegel Textile Corporation*, 484 F.2d 1025 (1st Cir. 1973); *La Gorga v. Kroger Company*, 275 F.Supp. 373 (W.D.Pa.1967). If the plaintiff produces substantial expert or lay evidence that a fabric which complied with the federal standard is nevertheless unreasonably dangerous for normal use, the plaintiff is entitled to a jury determination. 566 F.2d at 557–58.

able risk of harm when properly employed in ordinary service for its intended purpose. The claimed defect is one of design alone, that the right rear one of its four legs was so weakened by the manner in which the upper of two lateral braces was let into it as to give way under Mr. Quinn's weight. The testimony of three witnesses is relevant.

Mr. Quinn was the only witness who testified about the actual occasion of his fall, and he remembered very little about it. He did recall, and it is not disputed, that he bought the ladder from the retailer-defendant a short time before his injury and had used it only a few times. It was therefore all but new, and the defendants are and do not deny that they are responsible for its then condition. In July of 1970, he erected the ladder and climbed it to paint a building wall, carrying only a partly filled can of paint and a brush. Some short time later he heard a "crack," and the next thing he knew, he and the ladder were on the ground together, and his right arm was severely broken. He testified at one time that it was the right front leg which broke, at others that it was the right rear one, at still another that he does not remember whether any part of the ladder was broken after the fall, and finally that he remembers seeing a crack in a rear leg at that time. This is about all.

The list of what he might have been expected to recall but did not is long. He specifically testified that he could not remember: what part of the building he was painting, whether the front or the back of the ladder faced the working surface, what step of the ladder he was standing on, whether it was a high one or a low one, whether he was moving or standing still, whether he had both feet on the same step, how much he weighed or how tall he was, whether he was facing the ladder or the surface being painted, and many more significant details of the incident. In fine, though he was reasonably responsive on direct, he met cross-examination with a litany of "I don't knows."

Noting that Mr. Quinn was not well educated and was a manual laborer unversed in such contexts as the courthouse, we indulge in his favor the general inference that his meager and selective recall was the result of the accident's shock and the passage of time. Even so, its vague and conflicting nature, sometimes on such critical matters as where the ladder failed, do not inspire much confidence in it. More, his inability to recall any details of the occasion whatever renders it untestable by cross-examination, as a practical matter. About all we know from him is that while he was somewhere on the ladder he heard a cracking noise and fell. We also select from his conflicting testimony on the subject that most favorable to his case: that after the accident he saw some sort of a crack in the right rear leg of the ladder. As is apparent from the testimony of his expert, Dr. Muster, and from his own photographic exhibits, this must have been a very small one indeed.

Dr. Muster, the expert presented by Mr. Quinn, is a professor of mechanical engineering and the holder of numerous degrees, including a Ph.D. in Mechanics. He testified that he received the ladder from plaintiff's counsel about three years after the accident, in a condition indicating that it had seen hard service—weathered and paint spattered, with a "splint" nailed over the locus of the crack in question.[3] He ran no weight-bearing tests on the ladder but merely removed the splint and observed and photographed the ladder. In order to "enlarge" the crack in question so that he could make what he thought a suitable series of photographs of it, he laid the ladder on its side and removed the lower brace between its rear legs.[4] He then loaded weights onto

3. Mr. Quinn testified that his brother-in-law had fixed up the ladder and used it after the accident for some undetermined period of time.

4. He testified, and his photographs in evidence confirm, that after removal of the splint the ladder stood virtually straight, and the area around the crack "had the appearance of solidity." He was also clear that this weighting procedure was not intended as a test but merely to enlarge the crack so that he could get a better picture.

the extreme end of the ladder leg to widen the crack and photographed it. These weights came to around 25 pounds. Somewhere in this process, a temporary support slipped, and the leg broke completely off the ladder under the transverse pressure of the weights loaded on its end. This, of course, rendered any vertical weight-bearing tests on the ladder impossible, by him or by anyone else, and none were ever run on the actual ladder.

Dr. Muster was clear that a crack was present when he received the ladder but that the ladder leg was not broken off. His exhibits indicate a hairline check or crack of about one inch in length, running up the center of the right rear leg and disappearing under a washer of about one-inch diameter that secures the end of a steel rod reinforcing the ladder's upper brace along its length. When he broke the ladder, he saw from weathering patterns that some of the crack was old and some was new, but he did not testify to their respective dimensions.

His further testimony identified the area where he found the original crack and where he broke the ladder as its weakest point of design. This resulted, he testified, from the cutting of a mortise in the inner surface of each of the ladder's rear legs to receive the ends of the upper cross-brace. These spots were further weakened, in his opinion, by the drilling of a hole through the center of each mortise to admit the end of the steel reinforcing rod mentioned above, which was secured at each end by a washer and retaining nut on the outside face of each rear leg.

It was his evidence that the ladder is so designed that when it fails, as any structure must if sufficiently loaded, it is at these mortises that the failure will occur. He was also very clear that he had no idea at all what weight the ladder in question would bear without breaking, whether 100 or 1,500 pounds. All he knew was that at some load it would fail and that the failure would be at the spot identified. In response to several hypothetical questions, he opined that if the ladder failed at the point in question under the circumstances that Mr. Quinn described, it was defective. Some of these questions assumed facts not in evidence—such as that Mr. Quinn was on one of the two or three top steps on the ladder's five, or that at the time of the break Mr. Quinn "felt a twisting effect on the ladder"—but were allowed anyhow, over objection on this ground.

We indulge in Dr. Muster's favor the inference that he broke the ladder accidentally and without intending to do so and that a crack of some nature larger than that apparent to the naked eye was present when he received the ladder. In addition, we accept his testimony that the point of failure of this ladder is its weakest design point. Further, we accept his measurement of the mortise's depth at $\frac{3}{16}$ inch, of which more later.[5]

*Mr. Zetterland* was the expert presented by the defendants. He was a graduate engineer who had, in the course of his lengthy practice, designed aircraft structures of wood and investigated a number of ladder accidents.

His testimony commenced with identifying and the introduction in evidence of the various industry and governmental standards for ladder safety and design. He then testified to receiving the broken ladder after Dr. Muster's procedures and to tests

5. He also measured the hole in the leg through which the .16-inch steel rod passed at .25 inch, but since he could not say whether a smaller hole would or would not have made the leg more likely to fail, this is not of much significance. His observations here are well-nigh the only occult part of his testimony: that there is a trade off in strength between the greater stress engendered by using a smaller aperture and the loss of wood occasioned in making a larger one. By this we mean that, with all deference to his learning, we are not much startled to learn that a piece of wood that is cut into is weakest at that point or that a stepladder that collapses in normal use under the weight of an average man and a can of paint has something seriously wrong with it.

run by him on prototypes, the original being unavailable for these because broken.[6] Before the jury, he placed bathroom scales under the rear legs of one prototype and caused a man weighing more than Mr. Quinn had believed he weighed to climb to the fourth step, next to the top one. Each scale then registered about 40 pounds. Next he testified that it would be impossible for the weight of a man to break a ladder designed like these if the wood in it was sound. Next he referred to the various standards in evidence, including the OSHA standards, testifying that they specify that the brace in question, its mortises and its steel reinforcing rod, be designed as they were in the ladder from which Mr. Quinn fell. Further, he testified, the accident ladder complies with or exceeds all their requirements. He then described a load test performed to destruction by him on another identical prototype ladder, which resisted to 1,600 pounds of pressure.[7] The ladders in question were almost twice as strong as code requirements, he stated. He gave it as his opinion that the ladder in question could not have failed from any such static load as Mr. Quinn presented and must have failed from a dynamic load, a blow. He gave his measurements of the critical portions of the accident ladder: the rear leg being 7/16 inch wider than code requirements and the mortise being 1/8 inch deep ± 1/32 inch.[8] Finally, he pointed out that the ladders are of a stronger wood than the codes specify, one which receives an allowance under them.

On cross-examination, Mr. Zetterland admitted that the 1/4-inch diameter hole for the 1/6-inch diameter steel rod exceeded it in size by almost 50 percent.[9] He also admitted that if the ladder failed in proper use under Mr. Quinn's weight it was defective,

probably in materials, but that in his opinion (absent bad wood) it was impossible for it to have done so.

*The codes* in evidence, which we have read in pertinent part with care, reveal compliance with or excess of all requirements by the accident ladder.[10] As to the two claimed defects, the codes specify no size for the hole for the reinforcing rod and merely require that the mortise in the rear leg be not *less* than 1/8 inch in depth, without specifying a maximum. The dimensions are calculated on an assumption that so-termed Group 3 woods, such as sycamore, will be used. Denser, Group 2 woods, such as the Southern yellow pine of the actual ladder, may be reduced in dimensions by 11 percent since they are stronger.

This is the relevant evidence.

### Weight of and Inferences to be Drawn from the Evidence

It is clear that the ladder in question exceeds the codes in all respects relevant here. Mr. Quinn's claim of defect in the ladder is that when the mortise was cut in the ladder's right rear leg and the hole to accommodate the steel tie-rod was drilled through it, too small an amount of wood remained in the leg at that point to comply with code provisions and with safety. We are not engineers, but simple grammar-school mathematics which even judges are capable of performing makes manifest that this is not so as to code compliance.

Even if we assume that the codes specify a ladder with such dimensions as Mr. Quinn would have them do—a mortise not *more* than 1/8 inch deep and a hole for rod no larger than the retaining rod—the area of the permitted remaining cross-section would be as follows:

---

**6.** Without objection or dispute, he testified that the accident ladder was of the same design, configuration and material as the prototypes and would therefore have carried substantially "the same load."

**7.** He also testified that the weakest design point in the rear leg is at the bottom brace, not the top one. Since this conflicts with Dr. Muster's testimony, however, in the present posture of this case we must accept the latter.

**8.** Dr. Muster measured it at 3/16″, and we accept his figure.

**9.** The diameter of this hole is not specified in the codes.

**10.** E. g., U.S.A. Standard Code, § 4.2.4.3, and Table A1 on wood density.

Basic cross-section:

$3/4'' \times 1\ 5/16'' = .75 \times 1.3125$, or $\qquad$ .9844 sq. in.

Less wood removed by mortise:

$1/8'' \times 3/4'' = .125 \times .75,$[11] or $\qquad$ −.0938 sq. in.

Less wood removed by $1/6''$ diameter hole
for rod drilled through mortise:

$1/6'' \times (3/4 - 1/8)'' = .16 \times .625$, or $\qquad$ −.1000 sq. in.

.7906 sq. in.

The remaining cross-section in the accident ladder, by a comparable calculation, is

$3/4'' \times 1\ 3/4'' = .75 \times 1.75$, or $\qquad$ 1.3125 sq. in.

$3/16'' \times 3/4'' = .1875 \times .75$, or $\qquad$ −.1406 sq. in.

$1/4'' \times (3/4 - 3/16)'' = .25 \times .5625$, or $\qquad$ −.1406 sq. in.

1.0313 sq. in.

The above calculations, moreover, make no allowance at all for the 11 percent reduction permitted in code dimensions when a Group 2 wood is used.[12] Were this applied, the permitted code cross-section would obviously be five to ten percent smaller than our first calculation produces, but even without this allowance the critical remaining cross-section of the ladder exceeds code requirements significantly, in the ratio of about 1:1.3.[13] We must thus commence our evaluation of the evidence with a recognition that Mr. Quinn's ladder was designed to comply with identical and universal industry and governmental design requirements, indeed to overcomply and exceed them by a substantial amount. What exactly that excess is we need not determine, but it was doubtless not less than a safety factor of one-third and probably more on the order of one-half or more. Since it seems reasonable to assume that the approved designs themselves incorporate *some* safety factors, we contemplate a ladder very significantly over-designed at the point critical here.

Against this over-compliance we must range Mr. Quinn's very general testimony that he heard a "crack" as he fell and that there was a small crack in the ladder at the brace-mortise, as well as Dr. Muster's that this is the ladder's weakest design point and

that an old crack of some unknown length and depth was present there when he received it.

There remains the great body of undisputed testimony by Mr. Zetterland, though we unquestioningly accept that of Dr. Muster in the rather minor areas where there is conflict between them. Zetterland ran the only weight-resistance tests that were in evidence, and these indicated that identical prototypes of the ladder in question were designed to bear and did bear loads on the order of ten times that which Mr. Quinn would have it caused his to fail. We have studied Mr. Zetterland's testimony with great care and find it straightforward, consistent, unimpeached and—as to the weight-bearing capacity of such ladders as this—undisputed. In this respect Dr. Muster's evidence conflicts with it in no degree, since he was able to perform no such tests, having destroyed the ladder so that no tests on it were possible, and candidly admitted that he had no opinion about and no idea of its strength. To be sure, Mr. Zetterland's tests were run on prototypes; but the original could manifestly not be used because of Dr. Muster's destruction of it, and there was no contention that the prototypes were not as identical to it as possible, as Zetterland testified—without objection and without dispute.

On this evidence, we do not think that reasonable people could find that Mr. Quinn's ladder was defectively *designed.* Such a finding is not many orders of magnitude from one that the laws of gravity did not operate on the occasion of Mr. Quinn's fall. Even Dr. Muster did not directly criticize the ladder's design; he merely opined that the point in question was the design's weakest point. Every design must by definition have a weakest point, but that it has one is no evidence at all that the point is *too* weak or the design defective.

11. It is undisputed that the width of the mortise cut in cross-section is $3/4''$ both in the code and in the accident ladder.

12. A calculation somewhat complicated for judges, involving perhaps high-school-level mathematics.

13. A far more complex calculation by the defense, employing college-level math at the least, indicates a favorable ratio of code-ladder to accident-ladder of 1:1.6 even on Dr. Muster's figures and one of 1:1.777 on Mr. Zetterland's. Since these calculations are utterly beyond us, we consult our own.

Thus we are left with Mr. Quinn's recollection that he heard a cracking noise, that he fell, and that there he saw a crack—hairline to the eye, as his exhibits reveal—at the ladder's weakest point.[14] Mr. Quinn remembered only this about the accident and, as we have noted, he repeatedly and specifically denied any recollection of details whatever. Even what little he did recall was extremely vague, and that as to the presence or absence of a crack in the wood was conflicting and self-contradictory. His evidence is so general and meager as to suggest in one degree or another a myriad versions of the accident; he cannot prevail unless it reasonably supports the jury finding of failure of the ladder because of an unreasonably dangerous design. Even standing alone, it is a very weak reed to support such a finding.

But if it is considered in relation to other evidence which we conclude the jury were not authorized to disregard, it is overwhelmed. The jury could not properly disregard the undisputed evidence of industry and governmental design standards. Nor could they disbelieve the physical evidence before them demonstrating that, by plaintiff's own expert's measurements, the ladder not only complied with these but did so with generous margins of safety. Nor finally, we conclude, could they disregard Mr. Zetterland's evidence of the ladder's weight-bearing capacity. As we have noted, this was the only evidence of that kind before them and was undisputed, undenied and unimpeached. It was readily subject to dispute by tests—either of the original, had it not been destroyed in plaintiff's expert's hands, or by tests of other prototypes. In such circumstances, it has been held that such testimony, even by an employee of a party, must be taken as true where it was candid, the witness was not impeached, his credibility was not questioned, and his testimony was not controverted although, if inaccurate, it could readily have been shown to be so. *Chesapeake & Ohio Railway Co. v. Martin*, 283 U.S. 209, 51 S.Ct. 453, 75

L.Ed. 983 (1931). Our authorities are in accord. *Texas Co. v. Hood*, 161 F.2d 618 (5th Cir.), *cert. denied*, 332 U.S. 829, 68 S.Ct. 206, 92 L.Ed. 403 (1947); *cf. a fortiori, Turner v. Southern Railway Co.*, 437 F.2d 1352 (5th Cir. 1971) (wife's undisputed testimony as to loss of consortium).

■ It follows that since the evidence on the whole record was such that reasonable people could not have found the ladder defective in design, the trial court should have directed a verdict to this effect. *Boeing Co. v. Shipman*, 411 F.2d 365 (5th Cir. 1969). On appeal, our standard of review is the same as that court's. *Ibid.* We should therefore reverse if the point has been preserved for our review. That question is not entirely free from doubt, and to it we now turn.

### Was Sufficiency of the Evidence Preserved for Review?

■ It is the law in this circuit, as generally elsewhere, that the sufficiency of the evidence supporting a jury verdict is not reviewable on appeal, nor may a motion for judgment n. o. v. be granted, unless a motion for directed verdict was made at the close of all the evidence by the party seeking that review. Speaking of this rule, we have noted:

The reasons behind the rule are sound. For example, a litigant may not gamble on a jury's verdict and then later question the sufficiency of the evidence on appeal. . . . Similarly, the litigant who has not moved for a directed verdict in the trial court must have been of the view that the evidence made a case for the jury; he should not be permitted on appeal to impute error to the trial judge for sharing that view.

*Little v. Bankers Life & Casualty Co.*, 426 F.2d 509, 511 (5th Cir. 1970), quoted in support of the general rule at C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2536, p. 594. A reason for the rule

---

**14.** A point tied rigidly by a steel rod to the ladder's other rear leg, which no one asserts broke or cracked.

overlapping those given by us above as examples is to avoid making a trap of the motion for judgment notwithstanding the verdict, either at the trial stage or on appeal. When a claimed deficiency in the evidence is called to the attention of the trial judge and of counsel before the jury has commenced deliberations, counsel still may do whatever can be done to mend his case. But if the court and counsel learn of such a claim for the first time after verdict, both are ambushed and nothing can be done except by way of a complete new trial. It is contrary to the spirit of our procedures to permit counsel to be sandbagged by such tactics or the trial court to be so put in error.

The rule is a strict one, however, and we and other courts have taken a liberal view of what constitutes a motion for directed verdict for these purposes.[15] There is much to be said for the view that whenever a party, at the conclusion of the evidence and before the jury has begun to deliberate, clearly points out a claimed evidentiary deficiency to court and counsel, not by way of conversation or speculation but on the record in an unambiguous formal motion for relief, however denominated, this should suffice. To hold otherwise would be to succumb to a nominalism and a rigid trial scenario as equally at variance as ambush with the spirit of our rules.

This case requires us to determine whether formal motions made by each defendant, generally requesting a directed verdict and objecting to the submission of a special interrogatory on very specific grounds of evidentiary insufficiency, should by us be held unavailing to preserve the point.[16] If

---

**15.** 5A Moore's Federal Practice ⸿ 50.08, p. 50–88, citing, among others, our decisions in *Jack Cole Co. v. Hudson*, 409 F.2d 188 (5th Cir. 1969), and *Roberts v. Pierce*, 398 F.2d 954 (5th Cir. 1968).

**16.** The interrogatories concerned are, in pertinent part:

Interrogatory Number 1: Do you find from a preponderance of the evidence that the ladder in question was in a defective condition at the time it left the care, custody and control of the defendant Southwest Wood Products, Inc. . . .

If you have answered interrogatory number one "yes," and only in that event, you will answer interrogatory number two.

Interrogatory Number 2: Do you find from a preponderance of the evidence that the defective condition was a producing cause of the accident in question?

Defendant's objections to these and motions were, so far as pertinent here:

Comes now the defendant Western Auto Supply Company and files this its objections to the court's instructions and form of verdict after the reading of same to the jury and after argument but before the presentation of form of verdict to the jury, and respectfully shows the court as follows:

\* \* \* \* \* \*

II. The defendant further objects and excepts to the submission of special issue number one because there is no evidence, or there is insufficient evidence, to support the submission of an issue as to whether or not the design in this lawsuit was defective.

III. The defendant respectfully submits that the undisputed evidence in this case is the design of this ladder was not defective, considering all of the facts that go into the "design" of the ladder in question.

IV. The defendant objects and excepts to the submission of special issue number two for the reasons, with leave of court, first had and obtained to the submission of special issue number one, and further says that there could be no evidence in this case that a design in question could have caused the accident when there is no evidence that the design was defective.

\* \* \* \* \* \*

Wherefore, premises considered, for the reasons as set forth in the defendant's objections, the defendant respectfully requests the court to again submit the instructions as requested, *to declare a verdict for the defendant in this case*, or in the alternative to declare a mistrial because of the exclusion of evidence in this lawsuit.

Respectfully submitted by the defendant Western Auto and Supply Company.

The court: Those objections and requests will be overruled.

\* \* \* \* \* \*

The defendant Southwest Wood Products, if it may be permitted, joins with the defendant Western Auto in its objections to the court's charge . . . .

Secondly, for clarity, with regard to issues one and two, defendant objects that there is no evidence of a defective design upon which the jury could make an affirmative finding to those issues, in that in the most favorable light available to the plaintiff, the evidence of the plaintiff from Dr. Muster at the best is only evidence that the weakest point in the ladder is at the middle rung on the back legs,

we are so to hold, it can only be because they were made, not immediately after the evidence was closed but after argument and the delivery of the court's charge, at a time when the jury had formally been retired but before it had been permitted to commence its deliberations. This came about because the court, having submitted the case on special interrogatories only, sent the jury out with instructions to await receipt of the form of verdict before beginning to deliberate.[17]

■ We conclude that the procedure followed here, though somewhat anomalous, sufficed to permit the making of defendants' later motions for judgment non obstante on the same grounds and to preserve for our review the question of sufficiency of the evidence to support the finding of defective design.

Logic and the reasons underlying Rule 50(b) support our holding. Neither of these defendants can fairly be said to have gambled on the verdict, only later to question the sufficiency of the evidence on appeal. Their objections to giving the jury the issue of design defect were stated clearly and specifically on the record before its deliberations began, and they are the same ones defendants urged in their prior motions for directed verdict at the close of plaintiff's case and in their motions for judgment n. o. v. below and here. Certainly defendants did not ambush court or opposing counsel. To be sure, their motions and objections were made at a procedurally inconvenient time, after argument and the delivery of the charge. But, though late, the hour was

not so late that the evidence could not have been reopened had plaintiff wished to add more and, if necessary, further argument and instructions given. Nor did the court indicate any disposition to declare the motions or objections out of order or to deny them as untimely. Instead, he directed the jury to await their disposition before going to work. Plaintiff's counsel made similar objections to the submission of other issues to the jury, asking that they be withdrawn because insufficiently raised by the evidence; and the court clearly ruled on the merits of all parties' objections on such grounds. It is clear from the record that the court and the parties believed and intended that as a result of these motions and objections the dispositive issue of design defect—as well as others—might be withdrawn from the jury's consideration and a verdict instructed. Manifestly, the court did not in doing so intend to engage in a mock proceeding empty of content, and we refuse to assume it was such a thing. Let the reader be cautioned, however, that the timing of these procedures was anomalous and inconvenient; and had the court ruled these motions and objections by the parties out of order because untimely, a different question would be presented, one on which we need not and do not pass today.

Finally, our holding is not without footholds of support in authority. As we observed at note call 15 above, we have in the past taken a liberal view of what suffices to constitute a motion for directed verdict in such circumstances as these. In *Jack Cole Co. v. Hudson*, 409 F.2d 188, 191 (5th Cir. 1969), for example, we observed:

---

whether it will hold without failure at that point 150 pounds or 3000 pounds, and the evidence that that is simply the weakest point in the ladder, no matter at what weight it might break, is not evidence of design defect.

Therefore, an affirmative finding by the jury to issues one and two would be without supportive evidence, or in the alternative against the great weight and preponderance of the evidence, or based upon insufficient evidence.

Therefore, this defendant objects to those two issues on that basis. Thank you, sir.

The court: All right. I will overrule those. (emphasis added).

17. The court's instructions to this effect were:

Ladies and gentlemen, those of you who will serve, the six of you on the front row, I am going to ask you to retire now. Do not begin your deliberations, however, until the marshal brings you this form of verdict, and that will be your signal to begin.

The reason why we do it this way is that the law requires that I give the lawyers for the parties an opportunity to object to what I have said to you and try to get me to take back anything I may have said or say something more to you that they think I ought to say, and you are not to begin your deliberations until the marshal brings you this form of verdict. So you may retire at this time.

At the close of plaintiff's evidence, defendants notified the court of their desire to move for a directed verdict, and a formal motion, setting forth the specific ground that there was no evidence that the offending truck was owned by either defendant or that it was being operated on the day of the accident by an employee of either of them, was later presented to the court in chambers and denied. Although at the close of all the evidence defendants did not again make such a motion orally for the record, they did apparently make a request in chambers that the jury be instructed to find for them. This was refused, as was a similar request made in open court after the court's charge to the jury had been given.

There can be no doubt that the trial judge was well aware of the reasons for the requested jury instruction, and, under the circumstances, we hold that this constitutes a sufficient predicate for the subsequent motion for judgment notwithstanding the verdict. *Roberts v. Pierce,* 398 F.2d 954, 956 (5th Cir. 1968).

(footnote omitted). And later, in denying review in *Rawls v. Daughters of Charity,* 491 F.2d 141, 147 (5th Cir.), *cert. denied,* 419 U.S. 1032, 95 S.Ct. 513, 42 L.Ed.2d 307 (1974), we noted in passing:

Possibly, the undisputed evidence may have overwhelmingly supported the unlawfulness and involuntariness of her original confinement so that she might have been entitled to a motion for judgment notwithstanding the verdict on these elements. However, the impediment to granting this relief is that the record contains no indication that the plaintiff filed a motion for a directed verdict at the close of the evidence. Moreover, none of the plaintiff's requests for instructions to the jury fairly can be read as amounting to a request for a directed verdict. Therefore, this Court cannot consider plaintiff's contention that the district court erred in refusing to enter a judgment notwithstanding the verdict because a motion for a directed verdict is a prerequisite for relief on a motion for a j. n. o. v. under Fed.R.Civ.P. 50(b).

True, these scraps and hints of authority are scarcely crushing, but they point along the way that reason and logic take us in this case, a road that we would take in any event unless foreclosed by prior authority.

It follows that we are required, as we have, to review at defendants' behest the sufficiency of the evidence supporting the jury's finding of design defect at the mortise in this ladder's right rear leg. For the reasons given, we find the evidence to be such that, even indulging every legitimate inference in favor of the jury finding of defective design, reasonable people exercising an impartial judgment could not find as they did. We must therefore disregard the verdict, reverse the judgment for Mr. Quinn, and render judgment for the defendants. This disposition renders it unnecessary for us to pass upon the other issues tendered us.

REVERSED AND RENDERED.