UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 92-7224
_____


C.K. GREENWOOD,

                                    Plaintiff-Appellee,

     and

NATIONAL UNION FIRE,

                         Intervenor-Plaintiff-Appellee,

                    versus

SOCIETE FRANCAISE DE, ET AL.,

                                         Defendants,

SOCIETE FRANCAISE DE, and
INDIAN OCEAN BOAT CARRIERS,

                              Defendants-Appellants.

_____

          Appeal from the United States District Court for the
                    Southern District of Texas
          _____

                         April 28, 1997

Before JOHNSON, GARWOOD and JONES, Circuit Judges.

GARWOOD, Circuit Judge:

     Plaintiff-appellee C. K. Greenwood (Greenwood) brought this

suit against defendants-appellants Indian Ocean Bulk Carriers and

Societe Francaise de Transportes Maritime (collectively, the

Shipowners), pursuant to section 5(b) of the Longshore &

Harborworkers Compensation Act (the Act), 33 U.S.C. § 905(b), for injuries Greenwood received while unloading the Shipowners' vessel. The jury found in Greenwood's favor, and the magistrate judge conducting the trial rendered judgment for Greenwood. The Shipowners now timely appeal, alleging, *inter alia*, that there was insufficient evidence to sustain the jury's verdict. We agree and accordingly reverse the judgment in favor of Greenwood and render judgment for the Shipowners.

## Facts and Proceedings Below

On April 1, 1986, in Corpus Christi, Texas, the Shipowners turned over their vessel, M/V PENAVAL, to a stevedore which employed longshoremen to discharge the ship's cargo for that day and for the next three days. During that first day of operations, Greenwood worked as a member of a gang of longshoremen who were assigned to unload a cargo of pipe from a hatch on the deck of the vessel onto third-party trucks located on the dock. The longshoremen commenced their cargo operations around 7:00 a.m., and they used the ship's crane number four (as well as other of its cranes) to assist in discharging the pipe. The longshoremen had attached the stevedore's cargo discharging gear to the crane's hook. This gear consisted of a spreader bar that had cables on each end equipped with cargo hooks. The longshoremen attached the cargo hooks to each end of a joint of pipe. Since there were three cables and hooks on each end of the spreader bar, the longshoremen could transport three joints of pipe at a time. The spreader bar also had tag lines, which consisted of lengths of rope that were used for guiding the joints of pipe to the waiting truck beds. The

2

longshoremen's utilization of the cranes in the unloading operation was carried out without any supervision or intervention by the ship's crew.

During the morning of April 1, the number four crane was operated by longshoremen Kenneth Logue (Logue) and Wayne O'Neal (O'Neal), who worked alternating one-hour shifts. Concerning the time relevant to this case, Logue worked the first shift from 7:00 a.m. to 8:00 a.m., and he worked the shift from 9:00 a.m. to 10:00 a.m.; O'Neal worked the 8:00 a.m. to 9:00 a.m. shift. A few minutes after 9:00 a.m., Logue had just unloaded three points of pipe onto a truck bed and was swinging the crane's boom back over the ship for another load when one of the tag lines got hung up on something, apparently the truck. Logue testified that he attempted to halt the horizontal movement of the crane with the crane's slewing brake in order to ease the tension in the tag line. He further testified that the slewing brake—which controls the crane's horizontal movement—malfunctioned and the crane continued to move in a horizontal direction. The tag line then broke, causing the spreader bar and cargo hooks to swing outward. Greenwood was struck in the face with one of the swinging cargo hooks. No report was made to the ship about the accident, and the crane continued to be used without interruption by the two operators. Then, at approximately 11:30 a.m., the crane's boom brakeSQwhich controls the vertical movement of the craneSQbegan to malfunction. The ship's log indicates that this malfunction was due to a break in the boom brake's socket lining that occurred while the crane was in operation, but it was "[c]aught right in time" and the crane was

3

immediately shut down for repairs. The longshoremen crew received full compensation during the half hour of their work schedule that the crane was shut down. After the ship repaired the crane's boom brake, it continued to be used without incident that afternoon and for the remainder of the unloading operations.

Greenwood subsequently brought this suit against the Shipowners for the injuries he suffered as a result of being struck by the swinging cargo hook. At trial, the evidence revealed that all of the cranes' brakes were inspected on March 20, 1986. A report from that inspection showed that one of the slewing brakes on crane number four had been replaced with a part that was "not recommended." The operating condition of the crane's other slewing brake was described as being in "slight doubt."[1] The Shipowners did not inform the stevedore that anything might be wrong with the number four crane when they relinquished control of the vessel.

Logue, who was Greenwood's first witness, testified on direct examination that at the time of the accident he had been a longshoreman for thirty-two years and had operated cranes for twenty-five or twenty-six years. He stated that when he first started operating the crane at 7:00 a.m., he immediately realized that as to the horizontal or slewing motion it was "a little jerky"

---

[1] Greenwood also presented the Shipowners' journal entries describing the poor condition of the crane's roller electric cable, and the fact that "[f]rom beginning of work of cranes in Corpus Christi the socket of boom brake on crane 4 was not functioning properly." There is no evidence that any of these defects were related to the allegedly malfunctioning slewing brake which is claimed to have caused Greenwood's injuries. Logue testified there was no problem with the boom brake during the period of his operation described in his testimony.

4

and "when you did start slewing, you put it back in neutral, it would continuously kept slewing for a little ways."[2]  He explained, "If it keeps slewing, then you have got to try to adjust for it," and, "If it's not functioning properly then you try to allow yourself for thatSQfor whatever might be wrong with it."  He agreed that a crane operator, in his experience, can operate a crane even though it has a defect unless "it is too rough, if it's too bad . . . then you're going to get off of that crane.  I know I'm going to do it."  Logue testified that at 8:00 a.m. he reported the slewing-brake defect to his gang foreman, Quincy V. Guilford (Guilford), but made no other report concerning the crane. There is no evidence to suggest that the Shipowners were ever notified about the problem with the slewing brake's operation.[3]  After the accident, Logue continued to use the crane although the slewing brake was not then or thereafter repaired.

At the close of Greenwood's case, the Shipowners made a motion for directed verdict on the basis, among others, that they had no duty to warn of dangers with regard to the slewing brake, because the stevedore and longshoremen tested the ship's crane before using it in unloading and knew of the slewing brake's defect, and there was no evidence the Shipowners had actual knowledge that the crane

---

[2]    George Polinard (Polinard) corroborated this testimony. Polinard, another longshoreman who had frequently served as a crane operator, testified that he "observed that all of the cranes were not smooth at all, very jerky in their motions."

[3]    This view is supported by Guilford who testified that he did not remember Logue informing him about the defective slewing brake (or any defect in the crane).  He stated that he did not know about the defective slewing brake and did not inform his superior (the walking foreman) or the Shipowners about it.

was malfunctioning to such an extent that the stevedore's decision to continue using it was obviously improvident. The magistrate judge denied the Shipowners' motion for a directed verdict.

The Shipowners then presented their evidence and Greenwood offered his rebuttal evidence. The Shipowners did not renew their motion for directed verdict at the close of all the evidence. They did, however, timely object to the proposed jury charge based on the same grounds of insufficient evidence. This objection was also overruled.[4] Subsequently, the jury returned its verdict finding

---

[4] Specifically, after the magistrate judge had completed preparation of the proposed charge, and before it was read to the jury, the following colloquy occurred between Mr. Meyer (the Shipowners' attorney) and the court:

> "Mr. Meyer: . . . I feel compelled, because I have raised a motion to dismiss and a motion for a directed verdict, I must also ask the Court to not submit the issues asking whether there was a reasonably dangerous condition, Issue No. 1. Whether the plaintiffs knew or should have discovered that the crane was unreasonably dangerous, Issue 2. Issue No. 3 as the Court has set it out. And Issue No. 4, negligence as to the defendants. On the grounds that there is no evidence or insufficient evidence to justify submission of those issues to the jury.
>
> The Court: All right. Anything else?
>
> Mr. Meyer: I would alsoSQno, Your Honor.
>
> The Court: Very Well. The defendant's objections are overruled and request for additional instructions denied."

Issues One and Two inquired whether the crane was unreasonably dangerous when the Shipowners turned it over to the stevedore, and whether the Shipowners knew or should have known that. Issue Three asked if the hazard was one which was likely to be encountered by the stevedore. Issue Four inquired whether the Shipowners' negligence, if any, proximately caused Greenwood's injuries. These were the only liability issues; all were answered favorably to Greenwood.

the Shipowners were negligent and $3,234,984 in damages. The magistrate judge ultimately remitted $144,891 of this amount, resulting in a final judgment of $3,090,093. Following the verdict, the Shipowners filed a motion for judgment notwithstanding the verdict (JNOV),[5] raising the same arguments as they had presented in their motion for directed verdict that there was insufficient evidence that they had breached their duties of care to Greenwood. The magistrate judge denied this motion as well. The Shipowners now timely appeal, arguing, *inter alia*, that the magistrate judge erred in not granting their motions based on the insufficiency of the evidence.

**Discussion**

I.  Motion for Directed Verdict

Greenwood argues that although the Shipowners made a motion for directed verdictSQwhich was deniedSQat the close of the plaintiff's case, they failed to reurge the motion at the close of all of the evidence. Therefore, he contends that under Federal Rule of Civil Procedure 50(b), the Shipowners' insufficient-evidence claims cannot be reviewed on appeal.

"It is well-established law that the sufficiency of the evidence is *not reviewable on appeal* unless a motion for directed verdict was made in the trial court at the conclusion of all the evidence." *McCann v. Texas City Refining, Inc.*, 984 F.2d 667, 671

---

[5]    Effective December 1, 1991, Rule 50 of the Federal Rules of Civil Procedure was amended. Under the thus amended Rule 50, the "motion for directed verdict" and "motion for JNOV" are called "motions for judgment as a matter of law." The trial in this case took place before the effective date of that amendment.

7

(5th Cir. 1993) (citing *Hall v. Crown Zellerbach*, 715 F.2d 983, 986 (5th Cir. 1983)).  "Where this prerequisite has not been satisfied, a party cannot later challenge the sufficiency of the evidence either through a j.n.o.v. motion or on appeal."  *Bohrer v. Hanes Corp.*, 715 F.2d 213, 216 (5th Cir. 1983), *cert. denied*, 104 S.Ct. 1284 (1984).[6]

However, this Court has not required strict compliance with Rule 50(b) and has excused technical noncompliance where the purposes of the requirement have been satisfied.  *See, e.g., Adjusters Replace-A-Car, Inc. v. Agency Rent-A-Car, Inc.*, 735 F.2d 884, 888 n.3 (5th Cir. 1984), *cert. denied*, 105 S.Ct. 910 (1985); *Villanueva v. McInnis*, 723 F.2d 414, 417-18 (5th Cir. 1984); *Bohrer*, 715 F.2d at 216-17; *Quinn v. Southwest Wood Products, Inc.*, 597 F.2d 1018, 1025 (5th Cir. 1979); *Jack Cole Co. v. Hudson*, 409 F.2d 188, 191 (5th Cir. 1969); *Roberts v. Pierce*, 398 F.2d 954, 956 (5th Cir. 1968).  As noted in *Bohrer*:

> "'It is certainly the better and safer practice to renew the motion for directed verdict at the close of all the evidence, [however,] the application of Rule 50(b) . . . should be examined in the light of the accomplishment of its particular purposes as well as in the general context

---

[6]     This requirement serves two purposes:  (1) "to ensure that the trial court is invited to reexamine only the question raised by the motion for a direct verdictSQwhether the evidence is sufficient as a matter of lawSQand not to reexamine the facts properly found by the jury"; and (2) "to avoid making a trap of the judgment n.o.v. when the defendant's nonrenewal [of its directed verdict motion] is designed to avoid pointing out the defects in the plaintiff's proof, especially defects exposed by the defendant's case-in-chief, which the plaintiff might cure before the case is submitted to the jury."  *Miller v. Rowan Cos.*, 815 F.2d 1021, 1025 (5th Cir. 1987); *see also Seidman v. American Airlines, Inc.*, 923 F.2d 1134, 1137 (5th Cir. 1991); *Merwine v. Board of Trustees*, 754 F.2d 631, 634 (5th Cir.), *cert. denied*, 106 S.Ct. 76 (1985); *Bohrer*, 715 F.2d at 217.

of securing a fair trial for all concerned in the quest for truth.'" 715 F.2d at 217 (alterations in original omitted) (quoting *Bonner v. Coughlin*, 657 F.2d 931, 939 (7th Cir. 1981)).

These purposes are met when the court and the plaintiff are alerted to the grounds on which the defendant contends the evidence is insufficient prior to the submission of the case to the jury. *See Miller*, 815 F.2d at 1025; *Merwine*, 754 F.2d at 635.[7]

Our cases stand for the proposition that where a defendant has made a motion for directed verdict at the close of the plaintiff's case for insufficient evidence on specified grounds, and objects on those same grounds to the jury charge, this suffices to support a JNOV motion based on those same grounds.[8] Therefore, we hold that

---

[7] Although we will allow an objection or combination of objections to the charge to serve as the functional equivalent of a formal motion for directed verdict, *see Wells v. Hico ISD*, 736 F.2d 243, 251-52 (5th Cir. 1984), *cert. dismissed*, 106 S.Ct. 11 (1985), that functional equivalent must still satisfy our requirement that "a party may not base a motion for judgment n.o.v. on a ground that was not included in a prior motion for directed verdict." *Jones v. Benefit Trust Life Ins. Co.*, 800 F.2d 1397, 1401 (5th Cir. 1986) (citing *Sulmeyer v. Coca Cola Co.*, 515 F.2d 835 (5th Cir. 1975), *cert. denied*, 96 S.Ct. 1148 (1976)). Therefore, the grounds that a defendant urges in its JNOV motion and on appeal as a basis for its contention that it is entitled to judgment as matter of law must be presented in the defendant's functional equivalent of a motion for directed verdict. *See Hinojosa v. City of Terrell*, 834 F.2d 1223, 1228 (5th Cir. 1988), *cert. denied*, 110 S.Ct. 80 (1989). The issues concerning duty of care which were raised in the Shipowners' directed-verdict motion were also raised in their objections to the jury interrogatories, and in their JNOV motion.

[8] We do not suggest that this is the only procedure that will serve as the functional equivalent of a proper motion for directed verdict. Other procedures may also be acceptable as long as they fulfill the purposes behind Rule 50(b). *See, e.g., Wells v. Hico ISD*, 736 F.2d 243, 251-52 (5th Cir. 1984), *cert. dismissed*, 106 S.Ct. 11 (1985) (reviewing insufficiency of the evidence where defendant only objected to the submission of the interrogatory as not supported by the evidence, but made no motion for directed verdict); *Villanueva*, 723 F.2d at 418. However, one essential

the Shipowners' objections to the charge "were a sufficient approximation of a renewed motion for directed verdict to support [their] later motion for judgment notwithstanding the verdict. To deny entertainment of [their] motion would be to 'succumb to a nominalism and a rigid trial scenario as equally at variance as ambush with the spirit of our rules.'" *Villanueva*, 723 F.2d at 418 (quoting *Quinn*, 597 F.2d at 1025).

II.  The Shipowners' Duties

The Shipowners' argument hinges on *Scindia Steam Navigation Co. v. De Los Santos*, 101 S.Ct. 1614 (1981). The *Scindia* court articulated the scope of a vessel's duty under section 5(b). "The basic principle which emerges from *Scindia* is that the primary responsibility for the safety of the longshoremen rests upon the stevedore." *Randolph v. Laeisz*, 896 F.2d 964, 970 (5th Cir. 1990). However, vessel liability may still arise in three instances:

> "1)  if the vessel owner *fails to warn* on turning over the ship *of hidden defects* of which he should have known.
>
> 2)  for injury caused by hazards under the control of the ship.
>
> 3)  if the vessel owner fails to intervene in the stevedore's operations when he has *actual* knowledge both of the hazard and that the stevedore, in the exercise of 'obviously improvident' judgment, means to work on in the face of it and therefore cannot be relied on to remedy it." *Pimental v. LTD Canadian  Pacific BUL*, 965 F.2d 13, 15 (5th Cir. 1992) (citing *Masinter v. Tenneco Oil Co.*, 867 F.2d 892, 897 (5th Cir. 1989))

---

aspect of any procedure is that at some time prior to the submission of the jury charge and the start of the jury's deliberations, the opposing party and the court are adequately notified of the objections of the party who subsequently challenges the verdict. *See McCann*, 984 F.2d at 672; *Seidman*, 923 F.2d at 1137-38.

10

(emphasis added).

The Shipowners contend that the magistrate judge erred in denying their motions for directed verdict and JNOV because Greenwood did not present sufficient evidence from which a reasonable jury could find the Shipowners liable under *Scindia*.

In reviewing the sufficiency of the evidence, we "consider all of the evidenceSQnot just that evidence which supports the nonmovant's caseSQbut in the light and with all reasonable inferences most favorable to the party opposed to the motion." *Maxey v. Freightliner Corp.*, 665 F.2d 1367, 1371 (5th Cir. 1982) (en banc). The jury's verdict must be upheld unless "the facts and inferences point so strongly and overwhelmingly in favor of" the movant for directed verdict "that the Court believes that reasonable men could not arrive" at a verdict against the movant. *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969) (en banc). "A mere scintilla of evidence is insufficient to present a question for the jury." *Id.* However, "If there is substantial evidence . . . of such quality and weight that reasonable and fairminded persons in the exercise of impartial judgment might reach different conclusions" then a directed verdict is not proper. *Maxey*, 665 F.2d at 1371.

The Shipowners argue, among other things, that there is insufficient evidence to support the jury's verdict that the defect in the crane's slewing brake was hidden, thus negating their first duty under *Scindia*. The Supreme Court held that the first duty extends to:

"[E]xercising ordinary care under the circumstances to

11

> have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property, and to warn the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and *that are not known by the stevedore* and would not be obvious to or anticipated by him if reasonably competent in the performance of his work. The shipowner thus has a duty with respect to the condition of the ship's gear, equipment, tools, and work space to be used in the stevedoring operations; and if he fails at least to warn the stevedore of hidden dangers which would have been known to him in the exercise of reasonable care, he has breached his duty and is liable if his negligence causes injury to a longshoreman." *Scindia*, 101 S.Ct. at 1622 (emphasis added).

Under this duty, a plaintiff must first show that the vessel owner had actual knowledge of the defect. However, "If the condition existed from the outset, the shipowner is charged with actual knowledge of the dangerous condition." *Hernandez v. M/V Rajaan*, 841 F.2d 582, 586 (5th Cir. 1988) (citing *Harris v. Flota Mercante Grancolombiana, S.A.*, 730 F.2d 296, 299 (5th Cir. 1984)); *see also Pimental*, 965 F.2d at 17 n.4. Logue testified that he noticed the defect in the slewing brake as soon as he began operating the crane, and this, arguably enhanced slightly by the ship's log's listing of the slewing brake as being in "slight doubt," constituted substantial evidence that the defect in the slewing brake existed before the stevedore received custody of the ship. On this basis, it could be found that the Shipowners were charged with knowledge of the defect. However, the mere fact that the Shipowners may be chargeable with knowledge of the defect does not end our inquiry under the first duty.

12

"[T]he defendant has not breached its duty to turn over a safe vessel if the defect causing the injury is open and obvious and one that the longshoreman should have seen." *Pimental*, 965 F.2d at 16; *see also Polizzi v. M/V Zephros II Monrovia*, 860 F.2d 147, 149 (5th Cir. 1988); *Morris v. Compagnie Maritime Des Chargeurs Reunis, S.A.*, 832 F.2d 67, 71 (5th Cir. 1987), *cert. denied*, 108 S.Ct. 1576 (1988). If the longshoreman knew of the defect, then it is considered open and obvious. *Pimental*, 965 F.2d at 16 (finding that the defects were obvious based on the testimony of two crane operators who stated that the defects were immediately noticeable). *See also, e.g., Burchett v. Cargill, Inc.*, 48 F.3d 173, 179 (5th Cir. 1995). Here, Logue testified on direct examination, and reiterated on cross examination, that as soon as he began operating the crane, he became aware of the defective slewing brake. Furthermore, Polinard, another longshoreman experienced in crane operation, testified that he was able to visually observe this defect in the crane's functioning. Therefore, whatever latent characteristics the alleged defect may have had before the longshoremen began to operate the crane, they became open and obvious before the end of the first (7:00 to 8:00 a.m.) shift during which Logue operated the crane. *See Scindia*, 101 S.Ct. at 1622 (a vessel's duty to warn extends only to defects "that are not known by the stevedore and which would not be obvious to or anticipated by him if reasonably competent in the performance of his work").[9]

---

[9] In *Scindia*, a winch was being used to lower cargo from a pallet into the ship's hold. 101 S.Ct. at 1618. The winch's

13

The defense did indeed present evidence, in the form of testimony by O'Neal, Guilford, and others, to the effect that the crane in question did not malfunction as Logue had claimed and indicating that the accident was either due to Logue's improper operation of it or to the truck in which the tag-line was caught driving off, causing the line to break, or to some combination of these. If this defense evidence were credited, however, the Shipowners would be entitled to judgment. Conversely, Logue's testimony was essential to Greenwood's case, and without it there would be no substantial evidence that Greenwood's injury was caused by a defect in the crane existing when the vessel was turned over to the stevedore. Greenwood's counsel has consistently recognized this and based his case on Logue's testimony.[10] There is really

---

braking mechanism was defective, and as a result the brakes would not quickly stop the descent of the winch. Although this defect was not visibly discernible, it was readily noticeable once the stevedore began operating the winch. *Id.* Therefore, the *Scindia* court found that the ship had "no duty or responsibility with respect to the ship's winch, which, if defective, was obviously so." *Id.* at 1625.

[10] In his opening statement to the jury, Greenwood's counsel stated Logue would testify that when he started using the crane at 7:00 a.m. on April 1, "as soon as he began moving the pipe . . . the brakes on the crane didn't work" and "you'll hear from him [Logue] that this was not a condition that started after they started unloading the ship. It wasn't something that broke. It was that way right from the start of the use of this crane."
Similarly, in his opening final jury argument, Greenwood's counsel relied on Logue's testimony, stating, *inter alia*:

"What we know in this case is that, first, the best person—the person in the best position to know exactly what happened the day of this accident is Mr. Kenneth Logue. . . . And what we do know is that Mr. Logue was very clear and very straight in his testimony, he didn't waver at all, that this crane did not work right from the start, that it never worked right all the way up to the time of the accident, and that this crane on this ship

14

nothing apart from this.  Greenwood's only meaningful liability witnesses were Logue and Polinard, whose testimony merely tended to corroborate Logue's.[11]  There was no expert testimony that the crane's slewing brake was defective—indeed, there was expert testimony that it was not—and there was no testimony as to any examination of the crane reflecting such a defect.  There are only two versions of the condition of the slewing brake and its relation to the accident:  Logue's version, that the crane's slewing brake from the very beginning never functioned properly, and the version of O'Neal and the defense witnesses that the slewing brake

---

caused this accident."

And, Greenwood's counsel ended his closing final jury argument by stating "this crane was not safe from the start, Mr. Logue told you over and over."

On appeal, Greenwood continues to rely on Logue's testimony, stating in his brief in this Court, among other things:

> "Kenneth Logue, the crane operator of crane number four at the time of the accident, was a 'gold star,' which is the highest class ranking among longshoremen. . . .  On the morning of Greenwood's accident, he began working crane number four at 7:00 a.m. . . .  Immediately, he noticed that he crane was not functioning properly; it was 'jerky,' and when put into neutral, it would continue to slew, or drift. . . .
>
> When he was relieved from his first shift at 8:00 a.m., Logue informed his gang foreman, Quincy Guilford, that the crane was not functioning properly. . . .  When he returned to work the 9:00 a.m. shift, however, he noticed no differnece in the manner in which the crane was operating. . . .
>
> Logue's testimony was corroborated by the testimony of George Polinard, . . . ."

[11]  Greenwood himself testified, but essentially had no information concerning the cause of the accident; Armistead, a rebuttal witness who was working with another gang and had never operated a crane, gave no significant testimony.

functioned acceptably and the accident was due to operator error and/or the truck's driving off with the hung up tag line. The record suggests no third version. Greenwood supported, and supports, Logue's version, as he must.[12] But under it, the first *Scindia* duty does not apply.

Greenwood argues that just because the danger is "obvious" does not necessarily offer a complete defense to a longshoreman's suit, and that the shipowner is still liable if the longshoreman's "only alternatives when facing an open and obvious hazard are unduly impracticable or time-consuming." *Pimental*, 965 F.2d at 16 (citing *Treadaway v. Societe Anonyme Louis-Dreyfus*, 894 F.2d 161, 167 (5th Cir. 1990); *Teply v. Mobil Oil Corp.*, 859 F.2d 375, 378 (5th Cir. 1988)). Greenwood contends that Logue had no alternative but to continue to use the crane because when machinery breaks down, as the longshoremen are normally told to "milk it along." This observation concerning cargo operations in general cannot substitute for evidence that such was the case in this particular instance. Greenwood presented no evidence that Logue was instructed to continue to use the crane despite the defect or that he would "face trouble for delaying the work." *Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 535 (5th Cir. 1986) (quoting *Stass v.*

---

[12]     Indeed, Greenwood could not procure a verdict and judgment thereon on the basis of Logue's testimony and then on appeal seek to sustain that verdict and judgment by repudiating that very testimony. *See, e.g., Ergo Science, Inc. v. Martin*, 73 F.3d 595, 598 (5th Cir. 1996) ("judicial estoppel prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same . . . proceeding"); *In the Matter of Double D Dredging Co.*, 467 F.2d 468 (5th Cir. 1972). *See also Scott v. District of Columbia*, 1996 WL 695211, 101 F.3d 748 (D.C. Cir. 1996).

*American Commercial Lines, Inc.*, 720 F.2d 879, 882 (5th Cir. 1983)). In fact, when the boom brake on the crane later began to malfunction, the crane was immediately shut down for half an hour and the longshoremen were paid for that dead time. This tends to show that when the Shipowners learned of a problem with the crane, operations would cease until the crane was repaired. Certainly, that alternative was not impracticable, and even if the repairs required some time, the longshoremen would be paid for the resulting down time. *See Teply*, 859 F.2d at 378 ("Ship owners are not liable for obvious dangers that injure contractors aboard their vessels unless the contractors, in order to avoid the danger, would be forced either to leave the job or to face penalties for causing delay"). Greenwood has failed to submit sufficient evidence to fit within the scope of this asserted exception to the general rule.

Finally, the Shipowners contend there is insufficient evidence that they had *actual* knowledge of the stevedore's improvident judgment to continue operating the crane, thereby negating the third *Scindia* duty.[13] The *Scindia* court held that this duty arises when the shipowner knows of the stevedore's "obviously improvident judgment" based on the fact that the shipowner "knew of the defect and that [the stevedore] was continuing to use it, [and therefore] should have realized the [defect] presented an unreasonable risk of harm to the longshoremen, and that in such circumstances it had a duty to intervene and repair the [defect]." 101 S.Ct. at 1626. We have interpreted this language as determining that "a vessel has a

---

[13] Greenwood admits that this case does not implicate the second *Scindia* duty, and we agree.

duty to intervene when it has actual knowledge of a dangerous condition and actual knowledge that the stevedore, in the exercise of 'obviously improvident' judgment, has failed to remedy it." *Pimental*, 965 F.2d at 17 (citing *Randolph*, 896 F.2d at 970; *Woods v. Sammisa Co.*, 873 F.2d 842, 854 (5th Cir. 1989), *cert. denied*, 110 S.Ct. 853; *Helaire v. Mobil Oil Co.*, 709 F.2d 1031, 1037 (5th Cir. 1983)). Therefore, in order to prevail under this third duty, the longshoreman must show not only that the shipowner had actual knowledge of the defect and of the stevedore's continuing use of the defective item, but also: "1) it had actual knowledge that the [defect] posed an unreasonable risk of harm and 2) actual knowledge that it could not rely on the stevedore to protect its employees and that if unremedied the condition posed a substantial risk of injury." *Randolph*, 896 F.2d at 971.

A difficulty in the above formulation is discerning what must be shown to demonstrate that a shipowner had actual knowledge of a stevedore's "obviously improvident judgment" such that the shipowner "could not rely on the stevedore to protect its employees." The shipowner's obligation to intervene under the third *Scindia* duty "is narrow and requires 'something more' than mere shipowner knowledge of a dangerous condition." *Singleton v. Guangzhou Ocean Shipping Co.*, 79 F.3d 26, 28 (5th Cir. 1996). This is because, "'The shipowner defers to the qualification of the stevedoring contractor in the selection and use of equipment and relies on the competency of the stevedore company.'" *Scindia*, 101 S.Ct. at 1624 (quoting with approval *Italia Societa v. Oregon Stevedoring Co.*, 84 S.Ct. 748, 753 (1964)); *see also Morris*, 832

18

F.2d at 71. Therefore, "It might well be 'reasonable' for the owner to rely on the stevedore's judgment that the condition, though dangerous, was safe enough." *Helaire*, 709 F.2d at 1039 n.12. The question then is when should it become obvious to a shipowner that a stevedore's judgmentSQbased on its specialized knowledgeSQis obviously improvident or dangerous. It seems to us that, consistent with *Scindia*'s basic thrust, in order for the expert stevedore's judgment to appear "obviously improvident," that expert stevedore must use an object with a defective condition that is so hazardous that anyone can tell that its continued use creates an unreasonable risk of harmSQ even when the stevedore's expertise is taken into account. *Randolph*, 896 F.2d at 971; *Woods*, 873 F.2d at 847.

In this case, there exists sufficient evidence that the Shipowners were charged with knowledge of the defect, and knew of the stevedore's continued use of the crane. However, there was insufficient evidence that the Shipowners had the *actual* knowledge that the operation of the crane with the doubtful slewing brake created an unreasonable risk of harm to the expert longshoremen. *See Randolph*, 896 F.2d at 971 (holding that although the defendants knew of the defect, "there was no evidence that the defendants were actually aware that an unreasonable risk of harm was thereby created"). Although one not operating the crane could see that it was "jerky," its thus observable malfunction was not so severe that the ShipownersSQwithout any specialized knowledge and who were not operating itSQwould necessarily have known that it posed an

19

unreasonable risk of harm.[14]  In fact, after the accident, no report by either the stevedore, Logue, or the other longshoremen was made to the ship, and the crane continued to be used, without any slewing brake incident, for the remaining three days of unloading operations.  There was simply no evidence that the fault in this slewing brake was such a serious defect that the expert stevedore's continued knowing use of it would be seen as "obviously improvident" by the Shipowners.

The evidence does not suffice to establish that the Shipowners violated any of the *Scindia* duties.[15]

## Conclusion

For the reasons given, we reverse the judgment for Greenwood and render judgment for the Shipowners.

REVERSED AND RENDERED

---

[14]    We have held a shipowner could properly be found to have had actual knowledge of an unreasonable risk evidencing the stevedore's "obviously improvident judgment," where the shipowner knew a defective winch was working improperly because it would temporarily repair the winch after each time that the winch "would slow down or stop unexpectedly causing pallets holding sacks of rice to swing precariously above the cargo hold."  *Hernandez*, 841 F.2d at 586.  However, in this case, since the Shipowners did not repair the slewing brake prior to the accident, and they were not made aware of its precise operational defects through some other form of close observation, there is no evidence that they had any actual knowledge that the erratic movement of the crane posed an unreasonable risk of harm.

[15]    Because of our conclusion in this respect, we do not reach the other issues raised by the Shipowners' appeal.