## THE MUTUAL.

## THE J. PERCY BARTRAM.

## BARNEY DUMPING BOAT CO. v. THE MUTUAL.

## SAME v. THE J. PERCY BARTRAM.

(District Court, D. Connecticut. January 9, 1897.)

1. ADMIRALTY PRACTICE—RELEASE ON STIPULATION—ADDITIONAL SECURITY.

After a vessel has been released on stipulation, she is freed forever of the lien, and the court therefore has no authority to require the claimant to give any additional security.

2. COLLISION—SCHOONER AND TOW—CHANGE OF COURSE—NEGLIGENT LOOKOUT.

Where a schooner collided at night with the hindmost of two dumpers in tow of a tug, held, on the evidence, that the schooner changed her course, and had a negligent or incompetent lookout, and consequently was solely in fault.

This was a libel by the Barney Dumping Boat Company against the steamtug Mutual and the schooner J. Percy Bartram to recover damages resulting from a collision.

Carpenter & Park, for libelant.

Goodrich, Deady & Goodrich, for the J. Percy Bartram.

Macklin, Cushman & Adams, for the Mutual.

TOWNSEND, District Judge. Libel in rem. A preliminary question is raised herein by motion of claimant to vacate order for additional security. The parties originally agreed that the bond should be fixed at $5,000, which was accordingly filed, and the vessel was duly released. Afterwards, on an ex parte application, the court made an order for additional security in accordance with the provisions of rule 23 of the district court rules in the Southern district of New York. The claimant has failed to file any additional bond, and claims that the court had no power to make said order, because there is no express rule authorizing the court to make such order in this district; and further because the vessel was released by consent upon the filing of said bond for $5,000. I think the point is well taken. In The William F. M'Rae, 23 Fed. 558, Judge Brown says:

"That a vessel discharged from arrest upon admiralty process by the giving of a bond or stipulation for her value, or for the payment of the amount claimed in the libel, returns to her owner freed forever from the lien upon which she was arrested, and can never be seized again for the same cause of action, even by the consent of parties, is a proposition too firmly established to be open to question. The Kalamazoo, 9 Eng. Law & Eq. 557; The Wild Ranger, Brown. & L. 84; The Union, 4 Blatchf. 90, Fed. Cas. No. 14,346; The White Squall, 4 Blatchf. 103, Fed. Cas. No. 17,570; The Old Concord, 1 Brown, Adm. 270, Fed. Cas. No. 10,482; Senab v. The Josephine, 4 Cent. Law J. 262, Fed. Cas. No. 12,663."

See, also, The Haytian Republic, 154 U. S. 118, 14 Sup. Ct. 992.

In The Union, 4 Blatchf. 90, Fed. Cas. No. 14,346, Judge Nelson holds that the vessel, having been discharged from arrest, upon the giving of bond or stipulation, returns into the hands of her owners discharged from the lien or incumbrance which constituted the foundation for the proceeding against her. See, also, Henry, Adm. Jur.

& Proc. p. 338, § 123. Whether there was any such mistake in fixing the amount of the original stipulation, or in discharging the vessel, as would authorize an order for the redelivery of the vessel, it is not now necessary to decide. The motion to vacate the order is granted.

At about 9 o'clock, on the night of September 28, 1895, the claimant, the steamtug Mutual, started from Canal street, North river, with a tow of two dumpers, bound for the dumping grounds at Sandy Hook. The dumpers were known as Nos. 12 and 2, and tailed one behind the other, No. 12 being ahead; each having from 60 to 80 fathoms of hawser. At about 10 o'clock on said night, the respondent, the schooner J. Percy Bartram, heavily laden with coal, passed Sandy Hook on the way from Philadelphia to New Haven. At about midnight, in the Narrows, between Staten Island and the Long Island shore, and opposite Bay Ridge, or the Crescent Club House on Long Island, the Bartram collided with dumper No. 12, causing her severe injury. Her owners have filed this libel against said steamtug Mutual and said schooner Bartram.

The answer of the schooner alleges that the dumper No. 12 was negligent in failing to steer after the tug, and in failing to have proper lights. There is no evidence to support the former allegation. There is such a preponderance of testimony to the effect that the dumper had one white light forward and one aft, properly displayed and burning, that this fact also must be taken as proved. It is true, the master and mate of the Bartram state that they saw no lights on No. 12, but their admissions as to the numerous shore lights and white lights of vessels lying at anchor, seen by them just prior to the collision, indicate that they may have mistaken the white lights of the dumper for other lights. They admit that they saw the staff lights on the tug, showing she had a tow. I find, in accordance with the preponderance of evidence, that there was no negligence on the part of the libelant.

It is claimed by the schooner that the collision was caused by the fault of the tug Mutual in not keeping out of the way of the schooner, and by the Mutual that it was caused by the fault of the schooner in porting her helm, and changing her course. At the time of the collision the night was clear. There was a southeast 10-16 knot breeze. The tide was the first of the flood. The schooner and tug sighted each other when they were about a mile and a half apart, standing green to green, the tug being about a point off the schooner's starboard bow, and the schooner, according to the tug's witnesses, being about four points on the tug's starboard bow. From all the evidence, I find that the schooner must have been making about six knots an hour. The course of the tug was originally southwest, but when first sighted by the schooner, she had shifted her course to south by east or southeast, and was heading somewhat towards the Long Island shore, in order to avoid the strength of the flood tide. When the vessels sighted each other, and for some time thereafter, the schooner was heading from north to north by east. That she changed her course, and that said change caused the collision, appears, not only from the testimony of the witnesses for the tug, but

also from the testimony of those on the schooner. In view of the contradictions and improbabilities in the latter, it is clear that the collision could not have occurred as it did unless the schooner changed her course. It further appears that the lookout and wheelsman on the schooner were incompetent or negligent. The master admits. that, although he saw the tug a mile and a half away, and knew she had a tow, he saw no light on either tow until he was within 500 feet of one and close on to the other, although it is admitted as to the former and proved as to the latter that each had proper lights burning. He says that he first saw the green light of the.tug 10 or 12 minutes before the collision, when she was a mile and a half away, about a point on his starboard bow, and steering about south by east or southeast, and he repeatedly states that she kept on that one point on his starboard bow for about 10 minutes. Again, he says he did not notice whether the tug was broadening off on his starboard bow. At the close of his testimony he was recalled to correct certain mistakes. As to this one, he says: ·

"Q. Did you make some correction of the bearing of the Mutual's green light from the time you first saw it? A. I say I didn't understand the question as put to me, and, naturally, if I was steering north, one-half west, and the two boats was steering south by east, that we would be going apart,—that we would be spreading. Q. That is, the light would draw further astern? A. Yes, sir. Q. That is, the boats approached each other? A. Which I am not able to give the distance."

But if the green light was first seen, as he and his wheelsman say, on his starboard bow, he could not have passed the tug 200 feet away, and collided with the tow, if he had held his course. That the tug must first have been on his port bow in order to allow such a collision, after he had kept his course for a mile and a half, seems manifest.

Accepting as true the testimony of the master ·as to the position of the schooner and tug, the ordinary rules of trigonometry and surveying make it mathematically certain that there could have been no collision if the schooner had kept her course. It is not claimed that the tug changed her course. A mile and a half—the distance between the tug and the schooner—is about 8,000 feet. The angle between the course of the schooner and the line drawn from the schooner to the tug is one point, or $11° 15'$. The natural sine of this angle, which would be a line drawn from the tug perpendicular to the course of the schooner, is .1951. .1951 of 8,000 feet would be 1,560 feet, so that the tug, when first seen, must have been 1,560 feet from the line of the course of the schooner. If the master's testimony is correct, the tug must have been approaching the line of the course of the schooner, and the tows behind it must always have been further from this line than the tug, so that, if the schooner had kept her course, she could not have passed the starboard side of the tug, some 200 feet away, and struck the forward tow. She certainly could not have struck it squarely on the bluff of the starboard bow. Counsel for the schooner, in his ingenious brief, claims that the following facts are proved: First. That the schoon-

er was headed N. ½ E.; the tug S. E. Second. That when the schooner first sighted the green light of the Mutual, it was about ahead, and a mile and a half away. Third. That the schooner was not going over five miles an hour. He further claims that the tug and tow were 1,300 feet long. Now, it is testified, and undisputed, that the tug and tow were going two miles an hour. If they were going two miles an hour while the schooner was going five miles, the tug must have gone over 3,000 feet while the schooner was reaching the point where the tug was first seen; and if the schooner did not change her course, the tows must have been several hundred feet away from the line of the schooner's course when they passed the schooner. The brief of counsel for the schooner argues that the tow was crossing the line of the schooner's course. If this were so, and the rates of speed were as claimed in said brief, the schooner could not have collided with said tow unless the tug, when seen a mile and a half away, was at least one point on the port side of the schooner, instead of ahead or on the starboard side. That the schooner was not heading N. ½ E. up to the time of the collision is shown not only by the foregoing facts, but also by the testimony of five witnesses on the tug Mutual, the tows, and on the tug Ramsay, all of whom swear that she did change her course. That the Mutual was "about ahead" of the Bartram when a mile and a half distant, or when first seen by those on board the schooner, is denied by the master of the schooner, who testified as follows:

"Q. How long a time before the collision had you seen the green light of the Mutual? A. Ten or twelve minutes. Q. And then she was a mile and a half away? A. Yes. Q. Where was she when you first saw her? A. On our starboard bow. Q. How many points? A. About a point."

It is denied by the wheelsman of the schooner, who testified as follows:

"Q. Up to that time you hadn't seen any tug? A. O, yes; I could see a tug-boat on the starboard bow, coming down. Q. How far away had you seen that light? A. About a mile. Q. How far on your starboard bow did those lights—the green light and the bright lights—show when you first saw them? A. About a point on our weather bow, I should judge that it was."

Again:

"Q. How much was she on your starboard hand a mile away? A. I dare say she was half a point."

The statement of the lookout of the schooner, who, according to the preponderance of his own testimony, and according to that of the wheelsman, did not see the light of the Mutual until just before the collision, is as follows:

"Q. How far away was she when you first saw the green light? A. Well, I suppose she was a couple of hundred yards, more or less. Q. And how did that light bear upon you? A. It bore about right ahead of us."

I do not consider it material how the light of the tug bore at that distance, nor that the testimony of this witness upon that point is of any weight in the circumstances. This testimony, however,

and that of a deck hand on the tug Mutual, is the only evidence which is claimed to support the argument that the Mutual was ahead of the schooner when a mile and a half away. The testimony of the deck hand, in fact, however, does not support any such contention. He says:

"Q. How far was the schooner away from you when you first saw the green light? A. About a mile away when I first saw it. Q. On what bow of your tug did you see the green light? A. Starboard bow. Q. Did you say anything when you saw this green light of the Bartram? A. Yes, sir. I reported it to the captain. Q. What did you say? A. I told him I saw a green ahead. He told me he saw it before. Q. How far was she away from you when she showed both her red and green light? A. I should think about 800 feet; around there somewhere; I couldn't say exactly; may be more or less. Q. What was done on your tug then? A. The captain tooted his whistle."

And it was only at this time and in this connection that he testifies, as stated in the brief for the schooner, that "when the schooner showed both lights, the vessels were head and head; dead ahead of each other."

Some further contradictions in the testimony of those on board the schooner, are the following: The master says, the lookout on the schooner reported the tug about 10 minutes before the collision. The lookout says the alarm whistle first attracted his attention to the tow. "He could see the green light a little ways before that." "Q. How far away was she when you first saw the green light? A. Well, I suppose she was a couple of hundred yards, more or less," and he then reported to the captain. Afterwards he says the tug was 60 or 70 fathoms away when he first saw her, and again he says the distance was 500 or 600 yards, and that the 200 yards referred to the time when the alarm whistle was given. The wheelsman says, "The collision occurred immediately after the lookout made his first report." The master testifies that about 20 minutes before the collision he changed his course from N. to N. ¼ E. The wheelsman says that for two hours before the collision he was sailing N. ¼ E., and that he made no change in said course up to the time of the collision. The master says the velocity of the wind that night was from 10 to 15 miles an hour; the lookout says it was a 5-knot breeze. Whether, therefore, this case be disposed of by accepting as true the evidence of the witnesses for the tug, or the evidence of the captain of the schooner, or by analyzing the contradictory evidence of the three witnesses on behalf of the schooner, and rejecting certain portions thereof, for the reasons already stated, it sufficiently appears that the collision could not have occurred without an inexcusable change of course on the part of the schooner. I am constrained to believe that when those on board of the schooner saw that she was far enough off to clear the tug, they changed her course for an anchorage near the Long Island shore, without looking out for the tow. The admitted facts that when the schooner neared the tug those on board the tug blew an alarm whistle, and, as the schooner passed, called out to look out for their tow, confirms this view. Decree for libelant against the schooner.