United States Court of Appeals
Fifth Circuit

**F I L E D**

**December 9, 2003**

Charles R. Fulbruge III
Clerk

Revised January 21, 2004

**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

---

02-30441

---

SYLVIA MOORE, ET AL,

Plaintiffs,

SYLVIA MOORE,

Plaintiff-Appellee,

VERSUS

ANGELA MV,

Defendant,

ANGELA MARITIME SHIPPING LTD.,

Claimant-Appellant.

---

Appeal from the United States District Court
For the Eastern District of Louisiana

---

Before DUHÉ, EMILIO M. GARZA, and DeMOSS, Circuit Judges.

DUHÉ, Circuit Judge:

Appellant Angela Maritime Shipping, Ltd. ("Angela"), claimant of the *in rem* defendant, M/V ANGELA, appeals a judgment in a § 905(b) action by Sylvia Moore, the surviving spouse of longshoreman Horace Moore ("Moore"). The district court held for the Plaintiff, finding vessel negligence and finding the decedent

five percent at fault.  We hold the award of nonpecuniary damages

to be excessive and hold that the court exceeded its authority in

increasing the security posted in lieu of the vessel.  Accordingly,

we remand for a reduction in the total damage award.

I.

Sylvia Moore sued under the Longshore and Harbor Workers'

Compensation Act (LHWCA), 33 U.S.C. § 905(b), the M/V ANGELA *in rem*

for the wrongful death of her husband, who was struck by falling

cargo while working for Stevedores, Inc. in the M/V ANGELA.

Section 905(b) provides a negligence remedy to a longshoreman or

his family against the vessel.[1]  Plaintiff had the vessel arrested,

and Angela filed a claim of owner, reserving all rights and

defenses and requesting the court to set security for release of

the vessel.  The court set security at $500,000, and ordered the

vessel released upon posting of a Letter of Undertaking in that

amount.  The vessel then departed the jurisdiction.

The M/V ANGELA is a seven-hold bulk carrier equipped with four

cranes.  The district court found that Moore's death was caused in

part by vessel negligence relating to the vessel's no. 4 crane,

which was being used to offload T-bar ingots of aluminum from the

---

[1]  That section provides, "In the event of injury to a person
covered under this Act caused by the negligence of the vessel, then
such person . . . may bring an action against such a vessel as a
third party . . . and the employer shall not be liable to the
vessel for such damages directly or indirectly . . . .    The
liability of the vessel under this subsection shall not be based
upon the warranty of seaworthiness or a breach thereof at the time
the injury occurred."  33 U.S.C. § 905(b).

vessel's no. 7 hold.  Moore was operating a forklift in the hold when a T-bar fell from a load carried by the ship's crane approximately 75 feet above the floor of the hold, striking Moore on his forklift.  The district court found vessel liability under section 905(b) and Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed. 2d 1 (1981).

Scindia outlined three duties shipowners owe to longshoremen: 1) the "turnover duty," relating to the condition of the ship upon the commencement of stevedoring operations; 2) the duty to prevent injuries to longshoremen in areas remaining under the "active control" of the vessel; and 3) the "duty to intervene."  Howlett v. Birkdale Shipping Co., 512 U.S. 92, 98 (1994) (citing Scindia, 451 U.S. at 167, 175-76).  Due largely to problems with the crane, the district court found a violation of all three duties.  First, the district court found that the vessel owner failed to warn on turnover of hidden defects of the crane.  Second, the court found that the injury was caused by a hazard under control of the ship. Third, the court found that the vessel violated its duty to intervene when it clearly knew of the crane's problems.  The court concluded that the defective crane caused Moore's death, assessing comparative fault 65% to Angela, 30% to Stevedores, and 5% to Moore himself.

The total damage award was $907,469.11, including $750,000 in non-pecuniary damages for loss of society.  The court entered a judgment for $862,095.66 and granted Plaintiff a post-trial

3

increase in security sufficient to cover the judgment.

Angela requested mandamus review of the district court's ruling on the increase of security, which this Court denied without opinion.  Angela timely noticed this appeal.

## II.

The district court had subject matter jurisdiction because this is an admiralty action against the vessel.  28 U.S.C. 1333 (1); Fed. R. Civ. P., Supp. Admiralty & Maritime Claims Rule C.  Jurisdiction is *in rem* only.

## III.

We must first determine whether the district court clearly erred in finding Angela breached a Scindia duty owed to the longshoreman.  We review factual findings only for clear error.  McAllister v. United States, 348 U.S. 19, 20 (1954); see also Theriot v. United States, 245 F.3d 388, 394 (5th Cir. 1998).

The "turnover duty" relates to the condition of the ship upon the commencement of stevedoring operations.  Scindia, 451 U.S. at 167.  This duty requires a vessel to exercise

> "ordinary care under the circumstances" to turn over the ship and its equipment . . . "in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter . . . will be able by the exercise of ordinary care" to carry on cargo operations "with reasonable safety to persons and property."

Howlett, 512 U.S. at 98 (quoting Federal Marine Terminals, Inc. v. Burnside Shipping Co., 394 U.S. 404, 416-17, n.18 (1969)).  The

4

duty extends to warning the stevedore of hazards with respect to its equipment known to the vessel that would likely be encountered by the stevedore and would not be obvious to him. <u>Scindia</u>, 451 U.S. at 167.

The court's finding that the turnover duty was breached is supported by the evidence. The court found that Angela was aware that there were serious problems with the crane as a result of complaints made to it by Coastal Cargo,[2] a stevedoring company that had used the crane for a few days just before Stevedores. After multiple breakdowns and repairs, the crane had weight limitations and restrictions on movement, and it moved erratically, jerking and surging at times. The court found that the problems with the crane were hydraulic, and that the crane had a poor maintenance record.[3] The district court found that, had Stevedores known the problems Coastal encountered with crane no. 4, this would have affected

---

[2] The record reveals that the first day Coastal tried the crane, it would not lift at all. After repairs, Coastal determined that the crane could lift only 10 tons instead of its usual 25. Coastal resumed using the crane to lift only 10 tons. The next morning, the crane had the same problem, was again repaired, was used for an hour before breaking down again. Over the next couple of days Coastal again used the crane for 10-ton loads.

Coastal's superintendent testified that the crane was not well maintained and that he had to tell the crane operator to "try to do one thing at a time with the crane, instead of trying to hoist up, swing and boom," all of which a crane usually can do at the same time.

[3] A post-accident inspection indicated that the crane had hydraulic leaks. The court believed from expert testimony and from viewing photographs of the crane that there was a serious problem with crane maintenance.

5

their operations.  This finding is supported by the evidence.[4]

Angela argues that a vessel has no duty to warn of dangers that would be obvious to a longshoreman of reasonable competence, such as a jerking crane.  This exception to the turnover duty applies if the defect causing the injury is open and obvious and one that the longshoreman should have seen.  Scindia, 451 U.S. at 167; Pimental v. LTD Canadian Pacific BUL, 965 F.2d 13, 16 (5th Cir. 1992).  The exception does not apply, however, if the longshoreman's only alternatives to facing the hazard are unduly impracticable or time-consuming or would force him to leave the job.  Pimental, 965 F.2d at 16; Treadaway v. Societe Anonyme Louis-Dreyfus, 894 F.2d 161, 167 (5th Cir. 1990); Teply v. Mobile Oil Corp., 859 F.2d 375, 378 (5th Cir. 1988).

The district court found both that the condition was not open and obvious and that the longshoremen's only alternatives to facing the hazards were unduly impractical, time consuming, and costly. These findings, too, have support in the evidence.  No one told Stevedores' crane operator, for example, of the problems Coastal experienced, even after he complained of similar problems.  Rather, a vessel representative told him to "slam" the control stick when

---

[4] When Stevedores began work, Stevedores was not informed by the captain (nor by anyone else) of the problems Coastal encountered or of the weight limitations or movement problems.  Stevedores began using crane no. 4 to lift substantially more than 10 tons at a time discharging T-bars.

he had problems with the crane.[5]  One might conclude that the vessel owner was suggesting mistakenly that any problem was operational, hiding the real problem that was hydraulic.  See, e.g., Scindia, 451 U.S. at 167 (recognizing ship owner's duty to warn of "hidden danger" known to him).[6]

To the finding that alternatives to facing the hazard were unduly impractical or time consuming, Angela contends that switching cranes would have involved no additional time or expense.  Support for the court's contrary finding lies in evidence that the

---

[5]  This fact distinguishes Greenwood v. Societe Francaise de Transports Maritimes, 111 F.3d 1239, 1247 (5th Cir.), cert. denied, 522 U.S. 995 , 118 S.Ct. 558, 139 L.Ed.2d 400 (1997), in which the court remarked that plaintiff "presented no evidence that the [crane operator] was instructed to continue to use the crane despite the defect."  Greenwood, 111 F.3d at 1248.

[6]  The district court was faced with conflicting testimony about whether the defective condition was open and obvious.  Stevedores' crane operator, Randall Faulk, whose testimony the court credited in part, testified that after the vessel's chief engineer instructed him to "slam" the control stick, he had no further complaints with the crane and heard no complaints from the people working in the hold.  Finding the crane's defect not to have been open and obvious, the district court credited the fact that Stevedore's initial complaint about the crane was met with a "superficial tip" suggesting operator error.
Other support for the finding lies in the testimony of marine surveyor Webster, who stated that hydraulic problems worsen under load and as the crane heats up.  Confirmation of that phenomenon was the discharge tally indicating that this accident occurred after a series of 18-bar loads were discharged.  Although Coastal Cargo's superintendent mollified the situation by lightening the loads to less than the crane's capacity, no one provided that information to Stevedores.  Finally, the court found the relevance of Webster's expert opinion "enhanced" by the captain's adamancy that there was nothing wrong with the crane.  All told, the record provides a sufficient foundation for finding that the crane's condition was not open and obvious.

7

other crane (no. 3) that could reach this hold was already in use and had problems of its own; that the vessel owner had in the past refused to accept responsibility for standby time of stevedores refusing to unload cargo due to repairs; and that longshoremen refusing to work might lose business because the trade is competitive.

The district court's account of the evidence is plausible in light of the entire record. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. City of Bessemer, N.C., 470 U.S. 564, 574 (1985). After reviewing the record, we are not left with a "firm and definite conviction" that a mistake has been made. Henderson v. Belknap (In re Henderson), 18 F.3d 1305, 1307 (5th Cir.), cert. denied, 513 U.S. 1014, 115 S. Ct. 573, 130 L. Ed. 2d 490 (1994). Accordingly, we find no clear error in the findings that the vessel owner violated the turnover duty and that the "open and obvious" exception did not exempt the vessel from the turnover duty.[7]

IV.

Appellant next questions whether vessel negligence was a legal cause of the accident. Angela argues that the accident was caused

_____

[7] Because we sustain the court's holding Angela liable for breach of the turnover duty, we will not discuss the "active control" duty or the duty to intervene. See Pimental v. LTD Canadian Pacific Bulk, 965 F.2d 13, 15 -16 (5th Cir. 1992) (evidence of liability under one of these Scindia duties sufficient to defeat motion for directed verdict for vessel owner).

8

not by the malfunctioning crane but by Stevedore's assembling the T-bars into loads of 18, a configuration it asserts is inherently dangerous. The district court found vessel fault "clearly contributed" to the accident, citing the vessel's failure to revisit the hydraulic pressure issues with the crane and the failure to inform Stevedores about the crane problems experienced by Coastal.

The evidence supports the district court's finding that erratic motions such as jerking of the crane caused the T-bar to fall from the load. Trial testimony also supports the inference that, had Stevedores been duly warned about problems with the crane, it would have conducted its operations differently. To be a legal cause of a plaintiff's injury, breach of a <u>Scindia</u> duty must be a "'substantial factor' in the injury." <u>Donayhey v. ODECO</u>, 974 F.2d 646, 649 (5th Cir. 1992). The evidence at trial amply supports the finding that the vessel's breach of the turnover duty was a substantial factor in causing the accident and Moore's death, so that the district court did not clearly err in its finding.

V.

We must next determine whether the district court erred in assessing only five percent of the fault to the decedent. The district court determined that although Moore was under the T-bar when it landed, he was not improperly driving the forklift under the path of the load. A flagman and hatch workers saw the load clear the hatch cover. When the flagman waved the load clear,

9

Moore and other workers resumed their duties in the hold. The testimony of the longshoremen uniformly supports these findings. The court also found that erratic motions of the crane probably "launched" the T-bar toward the middle of the hatch where Moore had just moved his forklift. The district court found that any fault on the part of Moore "derives from the fact that he should have seen the jerking of the crane and anticipated the worst from such erratic crane movement." We will not disturb the district court's choice to credit the foregoing testimony and assess very limited fault to Moore for not "anticipat[ing] the worst."

VI.

We are next asked to reverse the award of non-pecuniary damages because they are not available in § 905(b) cases. Whether damages for loss of consortium are recoverable is a legal question, subject to de novo review. Michel v. Total Transp., Inc., 957 F.2d 186, 191 (5th Cir. 1992).

The loss of consortium award is permissible in this § 905(b) case. Sea-Land Services, Inc. v. Gaudet, 414 U.S. 573, 585-91 (1974), and Nichols v. Petroleum Helicopters, Inc., 17 F.3d 119, 122-23 (5th Cir. 1994), each allowed non-pecuniary damages for longshoremen injured in territorial waters. Despite illogical discrepancies between the law governing injuries to longshoremen in territorial waters and persons governed by the Death on the High Seas Act or the Jones Act, we must apply the law as it is. Nichols, 17 F.3d at 123; United States v. Rayo-Valdez, 302 F.3d

10

314, 320 (5th Cir.) cert. denied, 123 S.Ct. 694 (2002).

## VII.

Angela also contends that $750,000 for loss of consortium is nevertheless subject to remittitur because it is excessive. Indeed, the district court determined that the evidence warranted "the highest award possible for non-economic damages," and fixed the amount based on awards for death in air crash cases. The determination of the extent of damages is for the trier of fact, and "in this area the appellate court should step lightly or not at all." In re Air Crash Disaster, 767 F.2d 1151, 1155 (5th Cir. 1985).

We review a trial judge's assessment of damages for clear error. Sosa v. M/V LAGO IZABAL, 736 F.2d 1028, 1035 (5th Cir. 1984); Fed. R. Civ. P.52(a). An award is excessive only if it is greater than the maximum amount the trier of fact could properly have awarded. Sosa, 736 F.2d at 1035. An appellate court may not determine excessiveness by comparing verdicts in similar cases, but rather must review each case on its own facts. Winbourne v. Eastern Airlines, Inc., 758 F.2d 1016, 1018, (5th Cir.1984), cert. denied, 474 U.S. 1036, 106 S.Ct. 603, 88 L. Ed. 2d 582 (1985); Sosa, 736 F.3d at 1035.

Damage awards in analogous cases "provide an objective frame of reference, but they do not control our assessment of individual circumstances." Wheat v. United States, 860 F.2d 1256, 1259-60

11

(5th Cir. 1988).[8]  We measure the award under the "maximum recovery rule," which "provides that we will decline to reduce damages where the amount awarded is not disproportionate to at least *one factually similar* case from the relevant jurisdiction."  Lebron v. United States, 279 F.3d 321, 326 (5th Cir. 2002)(internal citations and quotations omitted, emphasis in original).  To avoid substituting our opinion for that of the fact finder, we apply a multiplier or percentage enhancement to past similar awards, which is 33% for bench trials.  See Salinas v. O'Neill, 286 F.3d 827, 831 & n.6 (5th Cir. 2002) (noting 50% enhancement has been applied only in jury trials and 33% multiplier has applied in both bench trials and jury trials).

Here the Plaintiff and decedent had been married 6 months, after having been together for seven years and, as the district court found, had a truly loving relationship.  They married when they were approximately 50 years old and had no children together. The award for loss of love and affection in this case is excessive

---

[8]  There is some tension between the principle that we consider excessiveness based on the facts of the case before us and the utility of considering precedent, in analogizing the facts at hand to similar cases.  As Wheat observed,
   Although our determination is, by its nature, subjective, we do conduct our analysis within an objective frame of reference: damage awards in similar cases. We have stated that comparing damage awards in similar cases is helpful in determining whether a particular award is excessive.  On the other hand, we have also observed that we cannot determine excessiveness by comparing damage awards and that each case depends on its own facts.
Wheat, 860 F.2d at 1259 (citations omitted).

12

and constitutes an abuse of the trier of fact's discretion.

We agree with defendants that the air crash cases relied upon by the district court are not factually similar, as in each case the Court relied on the fact that other family members perished along with the spouse; one relied on the additional fact that the surviving spouse was left to raise a child without the decedent. In re Air Crash Disaster, 767 F.2d at 1157 ($500,000 maximum for wife lost along with three minor children); Caldarera v. Eastern Air Lines, Inc., 705 F.2d 778, 785 (5th Cir. 1983)($250,000 maximum for plaintiff having lost his wife of more than 12 years as well as their eight-year-old and plaintiffs' mother, and being left to raise his four-year-old by himself); Winbourne v. Eastern Airlines, Inc., 758 F.2d 1016, 1017 (5th Cir. 1984) (approving $500,000 for a loss of wife, when plaintiff also lost two children), cert. denied, 474 U.S. 1036, 106 S.Ct. 603, 88 L.Ed.2d 582 (1985).

Poignant factual distinctions are that Plaintiff herein lost no other family member from this accident, and that she and Moore had no dependent children. Cf. Winbourne, 758 F.2d at 1018 (noting that "[plaintiff's] entire family is gone"); Caldarera, 705 F.2d at 786 (noting "calamitous effect of the simultaneous bereavement"); see also Dunn v. Consolidated Rail Corp., 890 F.Supp. 1262, 1290 (M.D. La. 1995)(remarking "The loss of her husband's love, support and companionship in raising their children is one of the most profound effects on the life of [plaintiff].").

The highest award in a factually similar Louisiana case we

13

have found is $300,000.  See Fannin v. Louisiana Power & Light Co., 594 So.2d 1119, 1127 (La. App. 5th Cir.) ($300,000 for loss of consortium not abuse of discretion for "'Romeo and Juliette' scenario" and "true love affair" wherein couple courted for years and were married approximately 5 months, no children, when death occurred, leaving spouse "devastated" and "lost and in a daze"), writ denied, 600 So.2d 694 (1992); see also Easton v. Chevron Indus., 602 So.2d 1032, 1038 (La. App. 4th Cir.) (award of $100,000 to $300,000 was within the discretion of the trier of fact for death after 10 years' marriage, "very solid and loving," no children), writ denied, 604 So.2d 1315, and writ denied, 604 So.2d 1318 (1992).

We reach our conclusion primarily on the evidence in this record, and secondarily on the rough guidance provided by awards approved for similar injuries by the Louisiana appellate courts and the decisions of this court applying Louisiana law.  See Air Crash Disaster, 767 F.2d at 1157.  Applying the "maximum recovery rule" to the award in this case requires remittitur of the non-pecuniary award to 133% of $300,000, or $399,000 for non-pecuniary damages.  On the facts of this case, $399,000 is the maximum non-pecuniary award that could be made, subject to the discussion in the next section.

## VIII.

Angela next asks us to hold that the court exceeded its jurisdiction by awarding damages in excess of the security posted

to release the arrested vessel. The district court's in rem jurisdiction was based on the $500,000 letter of undertaking posted to release the arrest of the M/V ANGELA. The district court rendered judgment in an amount exceeding the security, and Plaintiff filed a post trial motion to increase security to cover the judgment.

The district court granted plaintiff's motion to increase security. The court noted that the $500,000 security originally ordered did represent "an amount sufficient to cover the amount of the plaintiff's claim fairly stated,"[9] because "the plaintiff's counsel stated on the record that he 'could live with $500,000.'" Increasing the security post-judgment, the district court remarked,

> The Court also recognizes that the vast majority of the award is for non-economic damages, which may well be unavailable to the plaintiff after the issue of its recoverability is considered by the Fifth Circuit. Under these circumstances, the Court finds that the defendant shall increase the amount of security to equal the amount of the judgment, plus accrued interest and costs. . . .

We find no legal support for a post-judgment increase in security. While it is true a district court may require "further security" at any time, 28 U.S.C. § 2464(b) & Supp. R. E(5)(b), we interpret the phrase to mean *substitute or replacement* security (e.g., when a surety has become insolvent) rather than *additional* security, except where the vessel was released by fraud,

---

[9] Fed. R. Civ. P., Supp. R. E(5)(a) (In rem security should be fixed "at an amount sufficient to cover the amount of the plaintiff's claim fairly stated.").

15

misrepresentation, or mistake of the court.[10]  Plaintiff does allege

that the district court "mistakenly" calculated Moore's claim, but

the fixing of security was based in part on Plaintiff's counsel's

own declaration to the court.  It was therefore not based on a

"mistake" of the court as discussed in the jurisprudence.[11]

We find no authority for the court to have required additional

---

[10]  See, e.g., The Wanata, 95 U.S. 600, 611 (1877) (Stipulation taken for property "is deemed a mere substitute for the thing itself" and "is binding on the Appellate Court, unless it appears that the property was released by misrepresentation and fraud."); Mosher v. Tate, 182 F.2d 475, 479 (2d Cir. 1950) (If court erred in ordering release of vessel without requiring sufficient bond from owners, court had power to order personal decree against owners if recovery was greater than security.); The Fred M. Lawrence, 94 F. 1017, 1018 (2d Cir. 1899)(If stipulation has become worthless by insolvency of surety and claimant does not comply with order to furnish additional security, court may strike answer and enter default judgment.).
    We express no opinion on the continued efficacy of the principle allowing in personam liability without personal service discussed in some of the cited cases which predate Admiralty Rule E(8), under which Rule a vessel owner may now enter a restricted appearance to defend an in rem action.

[11]  The district court did correct a mistake in the amount of the award (undoing an unwarranted reduction of the plaintiff's recovery by the Stevedores' percentage of fault, see Edmonds v. Compagnie Gen. Transatlantique, 443 U.S. 256 (1979)), and noted that the error was "strictly an oversight on the part of the Court."  That mistake was post-trial had no bearing on the court's pre-trial fixing of security.
    We agree with J.K. Welding Co. v. Gotham Marine Corporation, 47 F.2d 332, 335 (D.C.N.Y. 1931), in its recognition that "a unilateral mistake, such as a statement of the libelant's claim at too small a figure," is not good reason to compel the giving of additional security.  See also Industria Nacional Del Papel, CA. v. M/V ALBERT F, 730 F.2d 622, 626 (11th Cir.) (recognizing that new or additional security can be required if the original amount was insufficient due to fraud, misrepresentation, or "'the mistake of the court and not that of the claimant'"), cert. denied, 469 U.S. 1037 (1984) (quoting 7A Moore's Federal Practice ¶ E.14 at E-711 n. 30 (2d ed. 1983)).

16

security.  See United States v. Ames, 99 U.S. 35, 42 (1878) ("[T]he remedy of the libelants . . . was transferred from the property to the bond or stipulation accepted by the court as the substitute for the property seized."); The Steamer Webb, 81 U.S. 406, 418 (1871)("[N]othing but the [amount of the security] is within the control of the court."); Incas & Monterey Printing & Packaging, Ltd. v. M/V Sang Jin, 747 F.2d 958, 961 (5th Cir. 1984) (Release of vessel in exchange for posting of security transfers lien from vessel to fund representing security.), cert. denied, 471 U.S. 1117 (1985); J.K. Welding Co. v. Gotham Marine Corporation, 47 F.2d 332, 335 (D.C.N.Y. 1931) ("[T]he court can exercise as much authority over [the bond that is a substitute for the res] as if the vessel itself were in the custody of the court, but no more."), cited with approval in Incas, 747 F.2d at 962 n. 10.

The security and amount of damage award are therefore limited to the $500,000 sum in the original letter of undertaking.  See The Wanata, 95 U.S. 600, 611-12 (1877) (Where value of property held is insufficient to pay the loss, "it is not competent for the court to award damages against the sureties in the stipulation beyond the proceeds or value."); Cooper v. Reynolds, 77 U.S. 308, 319, 19 L. Ed. 931 (1870) (One essential requisite to jurisdiction in rem is seizure or attachment of property; "[w]ithout this the court can proceed no further; with it the court can proceed to subject *that property* to the demand of plaintiff.")(emphasis added); The Ann

17

Caroline, 69 U.S. 538, 548-49 (1864) (stipulator who has filed a bond or stipulation for definite sum in place of vessel cannot be compelled to pay more than expressed amount); Overstreet v. Water Vessel Norkong, 706 F.2d 641, 643 (5th Cir. 1983) (Bond that stands in the place of the vessel is "the sole property that is within the court's jurisdiction."); J.K. Welding, 47 F.2d at 335 (A stipulation for value represents "a new security of unfluctuating value in the place of the vessel."); The Mutual, 78 F. 144, 144-45 (D. Conn. 1897) (If, by giving of bond or stipulation for value, vessel is released and "freed forever," court has no power to order additional security.); but see Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A., 56 F.3d 359, (2d Cir. 1995) (upholding admiralty jurisdiction to enter judgment exceeding value of arrested res, which was a letter of undertaking, even though the owner filed a restricted appearance in the in rem action, for use in a later in personam action, limited only by res judicata/collateral estoppel principles).

The damage award in this case, to the extent that it exceeds the amount of security, must be modified.

CONCLUSION

We find no clear error in the findings that Angela violated its duty under Scindia in a manner that caused Moore's death, that Moore was five percent at fault, or that non-pecuniary damages are recoverable. The quantum of non-pecuniary damages is not sustainable on these facts, as discussed above. Because of the

18

amount of security posted, the total damage award may not exceed $500,000.  The matter is therefore

REMANDED for further proceedings in accordance with this opinion.

EMILIO M. GARZA, Circuit Judge, concurring in part and dissenting in part.

The majority opinion is improperly deferential to the district court's determination that Angela Maritime ("Angela") was aware of latent defects that were the cause of the accident and longshoremen Moore's death, and to its determination that the defects were not open and obvious to Moore's employer Stevedores, Inc. ("Stevedores"). Although the majority opinion is correct that we review the district court's findings of fact for clear error, we review the application of those facts to law *de novo*. Thus, applying the less deferential standard, I believe the district court improperly applied its own factual determinations to controlling legal precedent in sustaining liability against Angela under the "turnover duty." However, as I believe the district court properly found Angela liable under the "duty to intervene," I would affirm the judgment, vacate the district court's allocation of liability, and remand the case for a calculation of fault under the "duty to intervene." Therefore, I respectfully concur in part and dissent in part.

I

The 1972 amendments to the Harbor Workers' Compensation Act fundamentally changed both the duties shipowners owe to longshoremen and consequently the scope of the liability to which they are subject. Two Supreme Court cases, *Scindia Steam*

20

*Navigation v. De Los Santos*, 451 U.S. 156, 101 S. Ct. 1614, 68 L. Ed. 2d 1 (1981), and *Howlett v. Birkdale Shipping Co.*, 512 U.S. 82, 114 S. Ct. 2057, 129 L. Ed. 2d 78 (1994), have together outlined the relative duties of shipowners and stevedores to longshoremen, and the circumstances where liability against a shipowner can be sustained under 33 U.S.C. § 905(b). The *Scindia* Court explained that "[a]s a general matter, the shipowner may rely on the stevedore to avoid exposing the longshoremen to unreasonable hazards . . . . The ship is not the common employer of the longshoremen and owes no such statutory duty to them." 451 U.S. at 170, 101 S. Ct. at 1623. The *Howlett* Court emphasized the point explaining that "[t]he design of these changes was to shift more of the responsibility for compensating injured longshoremen to the party best able to prevent injuries: the stevedore employer." 512 U.S. at 97, 114 S. Ct. at 2063.

Nevertheless, a ship owes three duties to longshoremen: 1) the turnover duty; 2) the active control duty; and 3) the duty to intervene. *Howlett*, 512 U.S. at 98, 114 S. Ct. at 2063. The majority opinion relies solely on the turnover duty to establish liability. "The turnover duty requires the vessel to warn the stevedore 'of any hazards on the ship or with respect to its equipment,' so long as the hazards 'are known to the vessel or should be known to it in the exercise of reasonable care,' . . . and would not be obvious to or anticipated by [the stevedore] if

reasonably competent in the performance of his work." *Id.* at 98-99, 114 S. Ct. at 2063. Therefore the duty attaches only to *latent* defects of which the vessel has or should have had knowledge. That duty is extinguished, and in essence shifted to the stevedore, if the stevedore either gains actual knowledge of the defect, or if the stevedore should have anticipated its existence. *See id.* at 99-100, 114 S. Ct. at 2064. That duty does not shift "if the longshoremen's only alternatives when facing an open and obvious hazard are unduly impracticable or time consuming . . . ." *Pimental v. LTD Canadian Pacific Bulk*, 965 F.2d 13, 16 (5th Cir. 1992).

In addition to establishing a duty owed by the vessel to the deceased, the plaintiff must establish that the latent defect in the crane was the "legal cause" of the accident such that it was a "substantial factor" in the injury. *Donayhey v. ODECO*, 974 F.2d 646, 649 (5th Cir. 1992). Therefore, to sustain liability, Moore must show that Angela had (or should have had) knowledge of a latent defect in the crane which was not, and could not have been, discovered by Stevedores *and* was a substantial factor in the accident.

We review the district court's factual findings for clear error; however, we review both questions of law and mixed questions of fact and law *de novo*. *Theriot v. United States*, 245 F.3d 388, 394 (5th Cir. 1998). The clearly erroneous standard of review

22

does not "apply to decisions made by district court judges when they apply legal principles to essentially undisputed facts." *Walker v. Braus*, 995 F.2d 77, 80 (5th Cir. 1993).

The district court determined that "erratic motions such as [the] jerking of the crane caused the T-bar to fall from the load." It additionally concluded the jerking was due to a latent hydraulics problem of which Angela was aware, and of which Stevedores was oblivious. It relied on the expert testimony of Edward Webster to establish, as a general matter, "that a hydraulics problem worsens as the hydraulics heat up, which can be caused by the excessive weight of the loads lifted," and on the testimony of Coastal Cargo ("Coastal") employee Rene Falgoust to establish that the crane was experiencing hydraulics problems. While Webster's testimony is hypothetical and does not establish that the crane was suffering from a hydraulics problem at the time of the accident, Falgoust's testimony only refers to hydraulics problems the crane was experiencing while under Coastal's control, days before turnover, and not while it was under Stevedores' employ when the accident occurred.[12]

Strangely, the district court also adopted the testimony of

---

[12] Admittedly, while under Coastal control, the crane experienced severe difficulties. The crane was described as "broke down" and at one point it "would not hoist at all." The problems with the crane were so severe that Coastal twice stopped working and demanded that Angela repair the crane. Angela did so both times.

marine surveyor Ben Haveman who testified that his post-accident inspection of the crane "revealed evidence of hydraulic oil leakage that did not affect the operation of the crane, but that old cranes leak hydraulic fuel." It also adopted the testimony of Edward Roy, an expert in crane operations and inspections, who concluded, after his post-accident inspection, that the crane had "no structural deficiencies, only cosmetic problems." Finally, it concluded that "time was spent on repairs on April 27-28, 2000," days before turnover to Stevedores, by Angela in an effort to fix whatever problems the crane was experiencing while under Coastal's control.

Cumulatively, these findings of fact suggest that the crane had no latent hydraulics defect at the time of turnover, and that its jerking at the time of the accident must have had an alternate cause. It also establishes that, even if there were latent defects, Angela had no knowledge of them, as it believed that it had repaired whatever problems the crane was experiencing by the time of turnover. Vessel liability cannot be sustained if either there were no latent defects or the vessel did not have knowledge of the defects. *See Howlett*, 512 U.S. at 98-99, 114 S. Ct. at 2063. Thus the district court's finding that Angela had knowledge of a latent hydraulics defect at the time of turnover is insupportable by its own factual conclusions.

Even if there was a hydraulics problem, the real cause of the accident, as established by the district court, was the jerking of

24

the crane. The district court merely assumes the jerking was caused by a hydraulics problem. This jerking, whatever its cause, by Stevedores' own admission, was quite apparent to them. The district court in its factual findings determined that the Stevedores' crane operator had "a critical problem with the operation of the crane when he first used it." It also cited additional testimony from Stevedores' employees Henry Gaston, John Dunham, and Willie Davis establishing that the crane was operating erratically and was clearly malfunctioning. Thus, based on the district court's factual findings, it was clear to Stevedores that the crane was malfunctioning, and more importantly that it was jerking in a manner that eventually led to the accident.

The defect in the crane that is the stated cause of the accident was *open and obvious* to Stevedores. Even assuming the crane had a latent hydraulics defect, of which Stevedores was unaware, it was certainly aware of the jerking and erratic movements that were a clear manifestation, if not of a hydraulics problem, of a malfunctioning crane. Any longshoremen there, "if reasonably competent in the performance of his work," should have realized what would have been obvious to any laymen, that the crane was malfunctioning and was a danger to everyone around it. *See Howlett*, 512 U.S. at 98-99, 114 S. Ct. at 2063.

The majority opinion affirms the district court's conclusion that, even if the defects were open and obvious, there were no

25

viable alternatives to using the malfunctioning crane because: 1) using a different crane would have been unduly time consuming; 2) in the past, Angela had not accepted responsibility for stand-by time of stevedores refusing to unload cargo due to repair; and, 3) Stevedores would lose future business. Applying the incorrect standard of review, the majority opinion further concludes that "when there are two permissible views of the evidence" there can be no clear error.

The district court's view of the evidence is impermissible under our precedent. In *Greenwood v. Societe Francaise De*, 111 F.3d 1239, 1248 (5th Cir. 1997), we did not apply the 'no viable alternative' exception when a stevedore used a crane despite its open and obvious defects because "[the stevedore] presented no evidence that [the crane operator] was instructed to continue to use the crane despite the defect or that he would face trouble for delaying the work." *Id.* (internal quotations omitted). We relied on the fact that the vessel was never informed of the problem, *id.* at 1243, and that the crane operator knew immediately that the crane was not operating properly, *id.* at 1246-47, to absolve the vessel of liability.

Applying *Greenwood,* I believe the 'no viable alternative' exception should not be applied in this case. There is no evidence showing that Stevedores requested the crane be fixed or that operations cease until repairs were made. According to the

26

district court, the crane operator knew immediately that the crane was having problems. He complained to Angela about the crane's jerking and was advised to "slam the stick" to stop the jerking. Either the crane operator found the advise satisfactory or *he* made the decision not to inform Angela that the problem was more substantial and required more thoughtful attention. Further, there is no evidence Angela informed Stevedores that it would not make needed repairs, or that there would be reprisals for requesting repairs.

The only evidence suggesting that a dispute as to payment for down time during repairs might ensue was Coastal's records evidencing its dispute with Angela over such payment. There, however, is no evidence demonstrating Stevedores had access to those documents or otherwise had knowledge of that dispute prior to discovery in this case. Consequently, it could not have been deterred by knowledge of that dispute at the time it decided to not request repairs.

Coastal, in contrast, was not deterred by the potential for dispute with Angela. It twice requested that the crane be repaired, and both requests were honored by Angela. The purpose of the 'no viable alternative' exception is to sustain liability against the vessel when *the shipowner* creates conditions where the stevedore feels compelled to face an open and obvious hazard. This exception, however, should not be used to provide stevedores an

27

excuse for not demanding repairs in the face of open and obvious dangers to their longshoremen. This would defeat the intent of the 1972 Amendments to shift responsibility for the safety of the longshoremen from the vessel to the stevedore. *See Howlett*, 512 U.S. at 97, 114 S. Ct. at 2063.

These policy goals would similarly be defeated by excusing Stevedores' behavior due to the competitiveness of the industry. Stevedores will be less likely to request repairs if they know they will not be held liable for their failure to do so. OSHA regulations have already recognized this concern and require: "Cranes with a visible or known defect that affects safe operations shall not be used. Defects shall be reported immediately to the officer in charge of the vessel." 29 C.F.R. § 1918.55(a).[13] Shifting liability from the stevedore to the vessel would not only defeat the purposes of the 1972 Amendments and OSHA regulations, it would increase the likelihood of tragic accidents such as this one by eliminating the stevedore's incentive to demand repairs in the face of apparent danger to its employees.

Nothing in the record suggests, and the district court did not find, that Angela communicated to Stevedores that it would either not make repairs, or not compensate the longshoremen if repairs were requested. Nor does the record, or the district court's

---

[13] It is clear that Stevedores violated this regulation by not refusing to operate the crane once it determined it was malfunctioning.

28

findings, suggest that Stevedores requested repairs and was refused. The district court's conclusion that Stevedores' alternatives to facing the hazard were unduly impracticable is inconsistent with its own factual findings, the precedent of this Court, and with the policies behind the 1972 Amendments of the Harbor Workers Compensation Act as annunciated by the Supreme Court in *Scindia* and *Howlett*.

Although sustaining liability under the "turnover duty" is inappropriate, the Supreme Court has recognized two other duties shipowners owe to longshoremen: the "active control duty" and the "duty to intervene." *Howlett*, 512 U.S. at 98, 114 S. Ct. at 2063. The district court properly sustained liability under the "duty to intervene."[14]

The shipowner has a "duty to intervene and repair" if it knows of the defect and knows the stevedore's continued use of the machine "present[s] an unreasonable risk of harm to the longshoremen . . . ." *Scindia*, 451 U.S. at 175-76, 101 S. Ct. at 1626. This means that "a vessel has a duty to intervene when it

---

[14] Liability cannot be sustained under the "active control duty." This duty requires the vessel "exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas or from equipment under the active control of the vessel during the stevedoring operation." *Scindia*, 451 U.S. at 167, 101 S. Ct. 1622. If the vessel relinquishes control over an area or a piece of equipment to the stevedore the duty is extinguished. *See Pimental*, 968 F.2d at 16. At the time of turnover, Angela relinquished complete control over the crane to Stevedores. Therefore Angela fully extinguished its "active control duty."

has actual knowledge of a dangerous condition and actual knowledge that the stevedore, in the exercise of "obviously improvident judgment, has failed to remedy it." *Greenwood*, 111 F.3d at 1248. Additionally, the longshoreman must show that the shipowner: 1) had actual knowledge that the defect posed unreasonable risk of harm; and 2) actual knowledge that it could not rely on the stevedore to protect its employees. *Id.* As the shipowner defers to the expertise of the stevedore in the operation of the equipment, "[t]he shipowner's obligation to intervene . . . is narrow and requires something more than mere shipowner's knowledge of a dangerous condition." *Id.* at 1249 (internal quotations omitted). Thus, "for the expert stevedore's judgment to appear 'obviously improvident,' that expert stevedore must use an object with a defective condition that is so hazardous that anyone can tell that its continued use creates an unreasonable risk of harm even when the stevedore's expertise is taken into account." *Id*.

The district court found that the crane's "erratic motions were clearly observable by ship personnel, who alone did or should have recognized the mechanical problems reflected." Angela argues we should follow our holding in *Greenwood* where we did not apply the duty to intervene in a similar situation where a longshoremen was injured due to a crane's erratic jerking, and where the shipowner knew of the crane's problems and allowed the stevedore to continue to use the crane despite this knowledge. *See id.*

30

However, in that case we relied on the vessel's lack of "specialized knowledge" to find that it did not know that the crane "posed an unreasonable risk of harm." *Id.* That is not the case here. Angela had specialized knowledge that the crane had recently experienced severe hydraulics problems *evidenced by jerking and erratic motions*. Those problems required shutting down the crane and involved multiple days of repair work. Stevedores informed Angela that the crane was jerking and moving erratically, thus Angela affirmatively knew the crane was malfunctioning as it did under Coastal's control, and thus was likely a danger to the longshoremen, as it had been the week before.

Angela knew that Coastal, based on its expertise as a stevedore, had demanded the cessation of its use of the crane, at least in part, due to fear of injury to its longshoremen from the crane's jerking. Thus, after Stevedores informed Angela of the jerking and erratic motions, and did not cease operation of the crane, based on its specialized knowledge, Angela should have known that Stevedores' decision to continue working was improvident, and should have stopped use of the crane for inspection to determine the cause of the jerking.[15] Angela had specialized knowledge not

_____

[15] Although the crane may not have had a hydraulics problem, something was clearly causing the jerking and erratic motions. That something may, as Angela alleges, have been the way Stevedores was operating the crane. However, knowing the obvious danger the jerking, regardless of its source, posed to the longshoremen, Angela should have stopped use of the crane to determine the problem when Stevedores failed to do so.

31

only that the crane had recently malfunctioned, but also that due to that malfunctioning the proceeding stevedore had demanded repairs. This specialized knowledge, coupled with its knowledge that the crane was malfunctioning as it did when Coastal demanded repairs, in a manner that was blatantly dangerous to the longshoremen, demonstrates that Angela was in a position to determine that continued use of the crane "posed an unreasonable risk of harm."

This result is consistent with the purpose of the 1972 Amendments as it allocates a portion of the liability to the vessel when it is in a unique position to prevent the relevant danger. Due to both its specialized knowledge of the crane's recent maladies, and knowledge of the crane's obvious malfunctioning while under Stevedores' control, Angela was in a position to veto Stevedores' improvident decision. This result, rather than absolving the stevedore of its responsibility for the protection of the longshoremen, as with the majority opinion's result, simply adds an additional layer of responsibility for their protection, in this case, to the shipowner, when it has "specialized knowledge" of an "unreasonable risk of harm" to the longshoremen.

## II

The district court determined that Angela was 65% at fault for the accident, Stevedores was 35% at fault, and that the decedent was 5% at fault. The district court enjoys wide discretion in

32

awarding damages, and its determinations are reviewed for clear error. *Trico Marine Assets Inc. v. Diamond B Marine Services Inc.*, 332 F.3d 779, 791 (5th Cir. 2003). Considering, under the "duty to intervene," the stevedore is primarily at fault for not ceasing use of the machinery, and the shipowner is only secondarily at fault for not vetoing that decision, the district court's allocation of liability is clearly erroneous because it does not apportion the largest percentage of fault to the party most responsible for the accident. *Cf. McDermott, Inc. v. Clyde*, 511 U.S. 202, 207, 114 S. Ct. 1461, 1465, 128 L. Ed.2d 148 (1994) (citing *United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 411, 95 S. Ct. 1708, 1715-16, 44 L. Ed.2d 251 (1975) ("when two or more parties have contributed by their fault to cause . . . damage . . . [liability] is to be allocated among the parties proportionately to the comparative degree of their fault")).

While not explaining its reasoning as to its determination of Angela's particular percentage of fault, the district court appears to have relied primarily on the turnover duty to establish the vessel's liability.[16] As it further concluded that the latent hydraulics defect was the primary cause of the accident, it allocated the lion's share of fault to Angela.

---

[16] Although the district court established liability under each of the vessel's duties to longshoremen, it primarily relied on the turnover duty to establish Angela's fault and thus the vessel's allocation of fault.

33

As explained above, the true cause of the accident was the jerking of the crane, a symptom of either problems with the crane or with its operation by Stevedores. Either way, as the crane was under the full active control of Stevedores, and the turnover duty was not violated, the decision to operate the jerking crane rested with Stevedores, and thus the primary responsibility for the accident also lies with it. Angela did, of course, have both the opportunity and the responsibility to veto Stevedores' decision; however, as established in *Scindia* and *Howlett*, the stevedore retains the primary responsibility for the safety of the longshoremen. *Scindia*, 451 U.S. at 170, 101 S. Ct. at 1623; *Howlett*, 512 U.S. at 97, 114 S. Ct. at 2063. Thus, the district court's determination of fault cannot be sustained.

### III

For the preceding reasons I would affirm the district court's judgment under the "duty to intervene" only. I would vacate the district court's allocation of liability and remand for calculation of fault under the "duty to intervene" only. I would lastly affirm both the reduction in the non-pecuniary damages award and the district court's holding that it lacked authority to increase the security post-judgment. Accordingly, I concur in part and dissent in part.

34